Clifton J. SHEDELBOWER,
Petitioner–Appellant,

v.

Wayne ESTELLE, Respondent–Appellee.

No. 87–6217.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 1988.

Decided Sept. 12, 1989.

Richard Avila, Deputy State Public Defender, Los Angeles, Cal., for petitioner-appellant.

Carolyn D. Fuson, Deputy Atty. Gen., Los Angeles, Cal., for respondent-appellee.

Before SNEED, HUG and ALARCON, Circuit Judges.

HUG, Circuit Judge:

Following a petition for rehearing in this case, the panel has determined to withdraw its former opinion, filed October 12, 1988, 859 F.2d 727.

This habeas corpus case involves the question of whether a confession by the appellant should have been suppressed under the rules set forth in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Clifton Shedelbower, a California state prisoner serving a life sentence without possibility of parole for murder and a consecutive 29–year sentence for rape and related crimes, appeals the district court's denial of his writ of habeas corpus. He asserts that his confession was the product of deception and improper in-

terrogation after he had requested an attorney. We conclude that there was no violation of Shedelbower's constitutional rights. We therefore affirm the district court's denial of the writ of habeas corpus.

## I. *FACTS*

The California Appellate Court sets out in detail the underlying facts in its opinion of *People v. Dominick,* 182 Cal.App.3d 1174, 227 Cal.Rptr. 849 (Cal.Ct.App.1986).

We briefly summarize them here. On November 29, 1981, Danny Harris, a 16–year–old boy, and Kim M., an 18–year–old girl, were parked in the early morning hours on a mountaintop location overlooking the San Fernando Valley. In the vicinity were radar testing facilities operated by ITT. These facilities had formerly been part of a Nike missile base and included vacant missile silos.

Michael Dominick and Steven Romero were security guards at the facility. Romero was on duty; both were in uniform. Clifton Shedelbower, a friend of Dominick and Romero, was present with them at the ITT facility in the early morning hours on November 29, 1981. The three discovered Danny and Kim parked in the area and on the ruse of a security check Shedelbower and Romero led Kim to a missile silo and beat and sexually assaulted her while Dominick held Danny elsewhere. Dominick later joined them and raped and sodomized Kim. The three then decided they had to kill both Danny and Kim. Danny was beaten to death with a closet pole. Romero attempted to beat Kim to death in the same way while Shedelbower held her. However, after the first blow, Kim broke away and fell down an embankment. She was left for dead. She struggled to the top, but when she heard a pickup truck approaching, she went back down the embankment to try to hide. She heard male voices asking her if she needed help. She looked up to discover a hand extended and, to her horror, she recognized that the men were her three attackers. Romero stabbed her three times in the chest and she fell down the hillside, but rose to run. Romero ran after her.

When she fell again, he stabbed her 17 times in the back and left her for dead. She lay there all that day and the next, and on the night of the third day she finally managed to climb back up to the road and walk to a house. An ambulance was called and she was taken to a hospital. She was treated for the 20 stab wounds, a broken shoulder, a collapsed lung, and numerous abrasions and lacerations. While Kim was still being treated at the hospital, she identified Dominick and Romero from two photo lineup cards of six photographs each. The officers learned from Dominick, who was then in custody, that Shedelbower was the third suspect with Dominick and Romero on the hilltop the evening of the murder of Danny and the attack on Kim.

On December 3, 1981, the officers went to Shedelbower's home and brought him in handcuffs to the local sheriff's station around 7:00 p.m. for questioning. They read him his *Miranda* rights, but stated that he was not under arrest.[1] Shedelbower said that he understood his rights and would speak without an attorney present.

The officers asked him what he was doing on November 29, 1981, the night of the rape and murder. Shedelbower admitted being with Dominick that night, around 1:00 a.m. at the ITT facilities where the murder and rape took place and, further, admitted meeting up with Steven Romero. For approximately three quarters of an hour, Shedelbower told the police of his activities on the night of the murder. At the conclusion, Shedelbower said that he "was scared ... about seeing bloody people." He said, "I was afraid they would turn on me afterwards. I don't know what possessed me to get involved with it." Finally, he mentioned something about a knife or knifing someone, and then said, "You know, I'm scared now. I think I should call an attorney." In response, the officers told Shedelbower he was now under arrest and advised him that if he wanted an attorney at that hour he would have

---

**1.** The state trial court held that this did constitute an arrest. Additionally, Shedelbower does not contest the timing or adequacy of the *Miranda* warning.

to call a private attorney or, alternatively, he could wait until the arraignment the next morning when a public defender would be appointed. This was around 8:00 p.m.[2]

The officers began gathering their materials in preparation to leave when one of them turned to Shedelbower and said that Dominick was in custody and that Kim had identified Shedelbower's picture as one of the men who raped her and murdered Danny. While it was true that Dominick was in custody at that time, it was not true that Kim had seen any photographs of Shedelbower.

Shedelbower then told the officers that "he had to tell us" and that "he wanted to talk about the case and he did not need any attorney present." This occurred approximately five minutes after he had first requested an attorney. The officers told Shedelbower that he had invoked his right to an attorney and, therefore, they were prohibited from talking with him any further. Shedelbower maintained that "he had to tell somebody."

The officers left the interview room, called the prosecuting attorney for advice, and arrived back in the room approximately one hour after they left, at 9:00 p.m. Pursuant to the prosecuting attorney's advice, they turned on a tape recorder and re-advised Shedelbower of his *Miranda* rights. He agreed to speak without an attorney present. He confessed. No promises of leniency or threats were made.

Dominick and Romero were tried jointly before two separate juries under a special California procedure. They were each convicted of the murder of Danny and the kidnapping, rape, and oral copulation of Kim. Romero was convicted of the attempted murder of Kim. Dominick was convicted of sodomy of Kim. Shedelbower waived a trial by jury and his case was tried by the court. The trial record consisted of portions of the testimony contained in the transcripts of the preliminary hearing, pretrial motions, and the testimony and evidence from the trial of Dominick and Romero.

The trial court admitted Shedelbower's confession into evidence, finding that the officer's statement to Shedelbower did not constitute further interrogation. Shedelbower was found guilty of murder, kidnapping with great bodily injury, rape, oral copulation, and attempted murder. On appeal, the California Court of Appeal affirmed his conviction, and the California Supreme Court denied review. Shedelbower filed a petition for a writ of habeas corpus in the United States District Court; the writ was denied. This appeal follows.

## II. *ANALYSIS*

### A. *Standard of Review*

Findings of historical fact by state courts are presumed to be correct under 28 U.S.C. § 2254(d), *Sumner v. Mata*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam). However, "the ultimate question of whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatable with the requirements of the Constitution is a matter for independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985).

### B. *Discussion*

Shedelbower frames his argument on appeal as follows: that, after he invoked his Fifth and Fourteenth Amendments right to counsel, the police continued interrogation in violation of *Miranda*. Shedelbower states in his brief that "the calculated falsehood was nothing less than a parting shot designed to ignite his natural instinct to offer a rebuttal...." The Government, on the other hand, contends that under the totality of the circumstances, Shedelbower voluntarily, knowingly, and intelligently waived his right to counsel under *Miranda*. Additionally, the Government asserts that Shedelbower initiated the subsequent conversation, which resulted in a confession. *See Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885 (had the suspect initiated the second encounter and then volunteered a state-

**2.** Shedelbower does not contend that this inter-   view violated his constitutional rights.

ment, nothing would prohibit the police from listening).

In *Miranda,* the Supreme Court held that the Fifth and Fourteenth Amendments' proscription against compelled self-incrimination required that any interrogation of a suspect in custody must be preceded by advice that he has the right to the presence of an attorney. *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630. After the advice, if the suspect requests an attorney, "the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1628. Furthermore, once an accused has invoked his right to the presence of counsel, he may not be subjected to further interrogation unless the accused himself (1) initiates further discussion with the police, and (2) knowingly and intelligently waives the right he previously invoked. *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984) (per curiam); *Oregon v. Bradshaw,* 462 U.S. 1039, 1042–45, 103 S.Ct. 2830, 2833–35, 77 L.Ed.2d 405 (1983).

■ The first question we face is whether the interrogation ceased immediately after he requested an attorney. Since the police spoke to Shedelbower five minutes after he requested an attorney, we must determine if those remarks constituted interrogation.

"Interrogation" means that the "questioning is initiated by law enforcement officers after a person has been taken into custody...." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. It not only includes express questioning but also its functional equivalent. *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). A functional equivalent of questioning is any statement or conduct which the police should know is "reasonably likely to elicit an [inculpatory or exculpatory] response from the suspect." *Id.* at 301 & n. 5, 100 S.Ct. at 1690 n. 5. The "response from the suspect" refers to any statement or non-verbal act which might be used against the suspect in court. *Id.* It can be in the form of a denial, an admission, an alibi, or any other inculpatory or exculpatory conduct. *Unit-*

*ed States v. Booth,* 669 F.2d 1231, 1238 (9th Cir.1981).

Since the officer's comments to Shedelbower were not in the form of express questions, they do not constitute interrogation in the normal sense of the word. Rather, we must determine whether it was interrogation in the sense described in *Innis,* where the statements were expected to elicit an incriminating response. The officer's statements were not the functional equivalent of questioning. They did not call for nor elicit an incriminating response. They were not the type of comments that would encourage Shedelbower to make some spontaneous incriminating remark.

■ We next consider whether Shedelbower's confession approximately one hour later was based on his own initiation of further discussion with the police, and whether there was a valid waiver of the right that he had previously invoked.

Approximately five minutes after he requested an attorney, Shedelbower said "he wanted to talk about the case and he did not need an attorney present." After the police officers responded by saying they could not speak with him because he had invoked his right to an attorney, Shedelbower repeated that "he had to tell somebody." These statements clearly "evinced a willingness and a desire for a generalized discussion about the investigation." *See Bradshaw,* 462 U.S. at 1045–46, 103 S.Ct. at 2834–35. Accordingly, Shedelbower himself initiated the continued discussion.

We must consider, however, whether the fact that the police spoke first after Shedelbower had stated that he wanted to call an attorney vitiates Shedelbower's express request for a further discussion. The remarks of the police were not an invitation to further discuss the matter. In fact, the police refused to do so until they spoke to the district attorney and returned and gave a further *Miranda* warning to assure that Shedelbower really wanted to discuss the matter without the presence of an attorney. As Justice Powell stated in his opinion joining the plurality opinion in *Bradshaw,* "Courts should engage in more substantive inquiries than 'who said what

first.'" *Id.* at 1051, 103 S.Ct. at 2838 (Powell, J., concurring in the judgment). The substantive inquiry after all is to assure that Shedelbower freely and voluntarily wished to discuss this case without the presence of an attorney.

If Shedelbower's request for further discussion had come after interrogation by the police or an invitation by them to talk about the matter further, then we could say that Shedelbower's specific request for further discussion had not been truly initiated by him. However, under the facts of this case, we hold it was Shedelbower who initiated the subsequent discussion.

■ Whether Shedelbower's conduct constituted a valid waiver of his right to the presence of an attorney depends on whether, under the totality of the circumstances, it can be said that the waiver was knowing and intelligent. *See Bradshaw,* 462 U.S. at 1045, 103 S.Ct. at 2834 (citing *Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1889 n. 9).

The Supreme Court in *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), sets forth the test to determine whether a suspect validly waived his *Miranda* rights. The two-part test is as follows:

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 573, 107 S.Ct. at 857 (citations omitted).

Although the police did falsely tell Shedelbower that he had been identified by the rape victim, the totality of the circumstances compels the conclusion that Shedelbower's taped confession was not the product of that falsehood, and that he was fully aware of the nature and consequences of his actions.

Shedelbower had already made incriminating statements linking him to the murder scene and to the two other codefendants. In light of his earlier admitted presence at the ITT facilities where the murder and rape took place, his reference to seeing bloody people, and the fact that Dominick was in custody, the false statement by the police was clearly an unimportant element in the mind of Shedelbower when he said that he had to tell someone what had happened. Not only had he indicated his presence at the scene, but he also had said that he was anxious about his involvement in the events and he had to get it off his chest. Looking at the entire recitation by Shedelbower and the admissions he had already made, it is indeed doubtful that the officer's statement to Shedelbower that he had been identified, played any role in motivating him to want to talk to them then or later to confess.

After Shedelbower insisted to the police that he needed to tell somebody what happened, the police officers told Shedelbower that they could not talk with him because he had requested an attorney. Indeed, the officers sought advice from the prosecuting attorney's office as to the proper procedure. Thus, it hardly seems reasonable that the police were eliciting a response from Shedelbower; otherwise, they would have stayed and listened to him confess right then. Instead, an hour passed before the police came back to talk with him. Additionally, they again gave him *Miranda* warnings and specifically emphasized to Shedelbower that he had a right to an attorney. Considering the totality of the circumstances—that Shedelbower made prior incriminating statements in the first interview with police, that the police officers initially refused to talk with him after he invoked his right to counsel, that it was Shedelbower who insisted on talking about the case, that the police officers made efforts to deal fairly with Shedelbower and sought advice from the prosecuting attorney, that Shedelbower had an hour in

which he could reflect upon his decision to confess, that he knew he could discontinue his confession at any time by invoking his right to remain silent under *Miranda*, that Shedelbower was given a *Miranda* warning subsequent to the comments by police and in that warning the right to an attorney was emphasized, and finally, that no threats or promises were made in order to secure the confession—we conclude that Shedelbower validly waived his Fifth and Fourteenth Amendments right to counsel.

The district court properly found that Shedelbower suffered no violation of his constitutional rights, and denied his petition for writ of habeas corpus.

AFFIRMED.