Jose Jacobo AMAYA–RUIZ,
Petitioner–Appellant,

v.

Terry STEWART, Director of the Arizona
Department of Corrections,
Respondent–Appellee.

No. 96–99011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 30, 1997.

Submission Withdrawn May 2, 1997.

Resubmitted July 24, 1997.

Decided July 31, 1997.

Edward H. Laber and Jose H. Robles, Tucson, AZ, for Appellant.

Paul J. McMurdie and Diane M. Ramsey, Attorney General's Office, Phoenix, AZ, for Appellee.

Before KOZINSKI, THOMPSON and FERNANDEZ, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge.

## OVERVIEW

In 1985, a jury convicted Jose Jacobo Amaya–Ruiz of first degree murder, manslaughter, theft, and first degree burglary. The state trial court sentenced Amaya–Ruiz to death.

Amaya-Ruiz appeals the district court's denial of his first federal habeas corpus petition. We have jurisdiction pursuant to 28 U.S.C. § 2253, and we affirm.[1]

## FACTS

Amaya-Ruiz, an illegal alien from El Salvador, worked for Kimberly Lopez (Kimberly) and her husband, Mark Lopez, on their ranch in Tucson, Arizona. On March 28, 1985, at approximately 9:00 a.m., Kimberly was speaking to her sister on the telephone. Through the telephone, her sister heard a knock at Kimberly's door, heard Kimberly open the door, and heard Kimberly say, "What are you doing? Leave me alone . . . I will give you the gun." The sister hung up and phoned the police.

The police immediately went to the Lopez's ranch. When they arrived, Kimberly was dead. She had been stabbed over twenty times and shot once, near her ear. The gunshot wound, however, was not fatal. Kimberly, who was approximately four months pregnant, bled to death over a period of ten to fifteen minutes.

While driving to the scene, a police officer reported seeing a "Mexican-looking male in a baseball cap" walking away from a truck which had run off the road. Two knives belonging to the Lopez's household were found in the truck. One knife had blood on it and was believed to be the murder weapon. Officers searched the area but did not find Amaya–Ruiz. They issued a bulletin to law enforcement officers to detain him if he was apprehended.

Later that evening, on March 29th, at approximately 12:15 a.m., railroad security officers apprehended Amaya–Ruiz while he was trespassing and attempting to board a train in Yuma, Arizona. Amaya–Ruiz was turned over to the United States Border Patrol. At the Border Patrol station, Amaya–Ruiz surrendered a loaded revolver he was carrying. The revolver matched a gun missing from the Lopez's ranch.

At approximately 9:00 a.m., a police detective questioned Amaya–Ruiz and Amaya–Ruiz eventually confessed to the murder. Officers also later determined that a bloody shoe print found near Kimberly's body at the murder scene matched Amaya–Ruiz's shoe.

Prior to trial, the state trial court ordered two competency evaluations of Amaya–Ruiz, held a competency hearing, and determined that he was competent to stand trial. A jury convicted him of first degree murder, manslaughter (for the death of the unborn child), theft, and first degree burglary. The state trial court sentenced him to death.

After an evidentiary hearing on Amaya–Ruiz's ineffective assistance claim, the state trial court denied his first state post-conviction petition. The Arizona Supreme Court consolidated his direct appeal and his appeal from the denial of his post-conviction petition. The Arizona Supreme Court reversed the manslaughter conviction but affirmed the convictions for the remaining offenses and the death sentence. *State v. Amaya–Ruiz,* 166 Ariz. 152, 800 P.2d 1260 (1990). The United States Supreme Court denied Amaya–Ruiz's petition for certiorari. 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991).

In September 1992, Amaya–Ruiz filed his first federal habeas petition with the district court. In this petition, he raised twenty-seven claims. The district court determined Amaya–Ruiz had procedurally defaulted several claims and determined the remaining claims were meritless. Amaya–Ruiz now appeals from the district court's denial of his first habeas petition.

---

1. Amaya-Ruiz filed his petition prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214. The new provisions of Chapter 153, therefore, do not govern our resolution of his appeal. *Lindh v. Murphy,* —— U.S. ——, ——, 117 S.Ct. 2059, 2067, 138 L.Ed.2d 481 (1997); *Jeffries v. Wood,* 114 F.3d 1484, 1494 (9th Cir. 1997).

## DISCUSSION

Amaya-Ruiz raises four issues on appeal. He argues his federal constitutional rights were violated because (1) the state trial court failed to order an additional competency evaluation during the pretrial, trial, or sentencing proceedings, (2) his trial counsel rendered ineffective assistance, (3) his confession was involuntary and he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights, and (4) he did not waive his right to be present during his mitigation/aggravation hearing.

### A. Additional Competency Evaluation

■ Prior to trial, the state trial court ordered two competency evaluations, held a competency hearing, and found Amaya-Ruiz to be competent. Amaya-Ruiz argues the state trial court should have ordered an *additional* competency evaluation of him during the pretrial, trial, or sentencing proceedings. According to Amaya-Ruiz, the state trial court's failure to order such an additional evaluation violated his federal constitutional right to due process.

■ The due process clause requires a state trial court to sua sponte inquire into a defendant's competency if "a reasonable judge would be expected to have a *bona fide* doubt as to the defendant's competence." *Moran v. Godinez*, 57 F.3d 690, 695 (9th Cir.1994); *see also United States v. Lewis*, 991 F.2d 524, 527 (9th Cir.1993). A bona fide doubt exists if there is "substantial evidence of incompetence." *Lewis*, 991 F.2d at 527; *see also Moran*, 57 F.3d at 695. "Although no particular facts signal incompetence, suggestive evidence includes a defendant's demeanor before the trial court, previous irrational behavior, and available medical evaluations." *Moran*, 57 F.3d at 695.

The issue presented by this appeal is not whether Amaya-Ruiz was in fact incompetent. *See Lewis*, 991 F.2d at 527. Instead, we must respond to the issue Amaya-Ruiz presents: whether his due process rights were violated because the state trial court had information before it which should have caused the court to have a bona fide doubt as to Amaya-Ruiz's competency and, thus, to order an additional competency evaluation. *See id.* In resolving this issue, we examine only the information that was before the state trial court at the time of the pretrial, trial, and sentencing proceedings. *Id.*

### 1. Background

Prior to trial, Amaya-Ruiz's counsel, Susan Kettlewell, moved the state trial court for a competency determination. The state trial court granted the motion and appointed Doctor Overbeck, suggested by Amaya-Ruiz, and Doctor LaWall, suggested by the prosecution, to evaluate Amaya-Ruiz.

In his report, Doctor Overbeck opined:

Amaya-Ruiz persisted in stating that he did not intend to answer the questions posed because he was not sure of what was happening. Repeated efforts were made, unsuccessfully, to explain events and secure his cooperation. It was this examiner's strong impression that Mr. Amaya-Ruiz had voluntarily decided to refuse to answer the questions in his own best interests—probably as a result of advice from other incarcerated prisoners.

When asked, the court interpreter described Mr. Amaya-Ruiz's behavior at the prior rule 11 interview as much more vocal, cooperative and expressive, reinforcing this examiner's belief that Mr. Amaya-Ruiz was not ignorant of the need to employ self-protecting strategies in his legal defense.... [H]is behavior suggested that he was well aware of the proceedings against him and intended to exercise due caution accordingly.

This examiner cannot unequivocally identify Mr. Amaya-Ruiz as either competent or not competent to stand trial. However, reasonable confidence is present that Mr. Amaya-Ruiz is probably capable of developing competence, assuming (a) the opportunity for brief tutoring in the terminology and process of the legal proceedings and, most importantly, (b) Mr. Amaya-Ruiz is willing to actively involve himself in the process.

Doctor LaWall opined in his report that:

[Amaya-Ruiz] had difficulty grappling with the concept of a jury but understood

in general the judicial process in criminal cases, that is [to] say he seemed to understand the state would attempt to prove him guilty of the charges against him....

He relates in a pleasant and cooperative manner

....

It's my opinion that this man understands the nature of the proceedings against him and is able to assist in his defense....

After receiving these reports, the state trial court held a competency hearing. During the hearing, Doctor LaWall answered affirmatively the State's question whether he believed Amaya–Ruiz was competent to stand trial and also testified: "In my opinion, he had adequate understanding, or at least the ability to understand the nature of the proceedings against him and assist his attorney." He further testified:

I couldn't separate how much was truly bewilderment to him and how much [was] him taking a stance of just not responding to anything.

...

I suspect that someone has advised him not to say anything to anybody, probably other inmates.

When asked whether he believed an additional examination of Amaya–Ruiz would be beneficial, Doctor LaWall responded:

Well, it is potentially a benefit, but I see a big problem in his assessment being the possibility of malingering, of faking ignorance, if you will, and I don't know how much of that was going on at the time I saw him versus genuine lack of understanding.

I have a suspicion that I might find the same thing again and it might be on the basis of malingering.

In response to the following questions, Doctor Overbeck testified:

Q: So you have a qualified opinion then that he is competent to stand trial at this time?

A: That he is competent to stand trial at this time, yes.

...

COURT: Exactly what is your qualification, that he would have to actively demonstrate that he was trying to understand and be tutored by somebody that he trusted?

A: Right.

COURT: Unless that happened —

A: Then I would be left with my educated estimate that he is competent.

At the conclusion of the hearing, the state trial court found Amaya–Ruiz competent to stand trial.

2. Subsequent Events

Amaya-Ruiz argues the following subsequent events should have caused the state trial court to have a bona fide doubt as to his competency and should have prompted an additional competency evaluation.

(a) Pretrial and Trial Proceedings

During the pretrial and trial proceedings, Kettlewell informed the state trial court that Amaya–Ruiz was not cooperating with her. She also informed the state trial court that she believed he was not competent and did not understand the criminal proceedings. She did not believe he understood the proceedings because, contrary to her advice, he refused to waive his speedy trial rights in relation to her motion for a continuance and, during a suppression hearing, he refused to waive his attorney-client privilege to allow his former counsel to testify about her experiences with him. During the proceedings, Amaya–Ruiz stated he did not want to waive his speedy trial rights because he did not "want more time" and "want[ed] this to finish."

Also, after each day of trial, Amaya–Ruiz asked whether the trial was over and, at one point, asked Kettlewell whether the spectators in the court or the jury would decide his fate. Kettlewell further told the state trial court that Amaya–Ruiz was unaware of the prosecutor's role and he did not understand what it meant to testify.

In this appeal, counsel for Amaya–Ruiz also points to his "irrational behavior" during the pretrial and trial proceedings, arguing

the following behavior should have raised a bona fide doubt as to his competency:

— During the continuance hearing, Amaya–Ruiz spoke out in a loud voice while Kettlewell was attempting to speak to him privately about waiving his speedy trial rights.

— He spoke out in a loud voice during the suppression hearing while a government witness was testifying.

— He attempted suicide by trying to hang himself in the jail. He made this suicide attempt because he was upset after learning his brother had died.

— On one occasion during the trial, he initially refused to change out of his jail clothing, into civilian clothing. Amaya–Ruiz eventually agreed to change his clothing.

These events were insufficient to cause the state trial court to have a bona fide doubt as to Amaya–Ruiz's competency. The state trial court previously had ordered two evaluations and the doctors opined Amaya–Ruiz was competent to stand trial. The evaluations suggested Amaya–Ruiz was malingering and had chosen a strategy of noncooperation. His behavior and statements that he did not understand the proceedings are consistent with a strategy of noncooperation. Further, while his behavior may not have been rational at times, his behavior was not so extreme as to require an additional evaluation. *See Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir.1985).

The evidence also indicates Amaya–Ruiz did not have a history of erratic behavior. The victim's husband and brother-in-law testified at trial that Amaya–Ruiz's behavior had been normal while he was living on the ranch. And, as noted by the district court, Amaya–Ruiz was capable of behaving appropriately before the jury and did not engage in any inappropriate conduct before the jury.

Amaya-Ruiz contends he could be found competent only if he acquired instruction on the criminal justice system. Although Doctor Overbeck implies Amaya–Ruiz could be deemed competent only if he acquired such instruction, Amaya–Ruiz had an opportunity to gain this knowledge. His counsel spoke Spanish and was available as a source of such instruction. Also, prior to trial, Anthony Ra-

mos, who spoke Spanish fluently, was assigned to the case, as co-counsel for Amaya–Ruiz, to tutor him on the justice system. The Arizona Supreme Court stated, "we will not consider [Amaya–Ruiz's] complaint that he lacked understanding of the United States justice system when this was largely the result of his willful noncooperation." *Amaya–Ruiz*, 800 P.2d at 1271.

We conclude the state trial court did not err by refusing to order an additional competency evaluation during the pretrial and trial proceedings.

#### (b) Sentencing Proceedings

■ Amaya-Ruiz also points to his conduct during the sentencing proceedings and argues this conduct should have prompted a further evaluation. During the sentencing proceedings, the following occurred.

The state trial court ordered the deputies to shackle Amaya–Ruiz for the mitigation/aggravation hearing. At the beginning of the hearing, Amaya–Ruiz insisted the court remove the shackles or remove him from the hearing. He stated:

> I want these to be taken off. I am not going to be here tied up. You can take me out of here. I'm not going to be tied up.

The state trial court explained Amaya–Ruiz had a right to remain but he would be removed if he continued with his interruptions. Amaya–Ruiz responded: "I am not going to be tied up. I want you to take these off." Amaya–Ruiz was removed and the hearing proceeded.

That afternoon, Amaya–Ruiz was returned to court for sentencing. At that time, the state trial court made the following minute order:

> The Court observes the defendant in the hallway outside of chambers prior to being taken into the courtroom for sentencing. The defendant is struggling with the deputies and shouting.

> The defense counsel ... is present and requests the Court to continue the sentencing to 9:00 A.M., on March 11, 1986.

> The Court determines, based on all of the prior evidence in the case and the

Court's own observations of the defendant during all stages of the trial and at this time, that the defendant is intentionally and knowingly hindering and obstructing the administration of justice, therefore counsel's request to continue sentencing is denied and the Sheriff is directed to gag the defendant and take him into the courtroom for sentencing.

The state trial court then asked whether the parties were ready to proceed. Kettlewell informed the court that Amaya–Ruiz was extremely upset and was not listening to the proceedings through the interpreter. She stated her belief that Amaya–Ruiz was not competent to be sentenced and moved for a further competency evaluation. The prosecutor stated he had no knowledge of Amaya–Ruiz's competency, and the state trial court responded:

> The court does not know either whether or not he is competent. I assume I can proceed to have a further determination of competency, but what I will do instead is continue this matter until 9 o'clock in the morning and see, Miss Kettlewell, if you can settle him down and talk to him, and if not I may have to have a further hearing to determine whether or not we have to send him to the Department of Corrections for a period of time to determine his competency again under Rule 11, to see if he is competent to be sentenced.

Counsel then approached the bench and Kettlewell said that she did not know whether Amaya–Ruiz would talk to her and her co-counsel or whether attempting to talk to him would "aggravate the situation." The following exchange then occurred at the sidebar:

> KETTLEWELL: If the court believes a further valuation [sic] needs to be done, then I think that is probably —
>
> COURT: I don't. I was merely wanting to give you time until the morning to talk to him.

The court then sentenced Amaya–Ruiz to death.

The state trial court was not required to order an additional evaluation based on Amaya–Ruiz's conduct during the sentencing proceedings. The court made an explicit finding that Amaya–Ruiz was intentionally attempting to hinder the proceedings with his disruptive conduct. This factual finding is entitled to a presumption of correctness. *See Fallada v. Dugger,* 819 F.2d 1564, 1569 n. 3 (11th Cir.1987) (holding findings on historical facts underlying competency issue are entitled to presumption).

The record supports this finding. As discussed above, the evaluating doctors indicated Amaya–Ruiz may have been faking incompetence and may have chosen to pursue a strategy of noncooperation. His conduct during the sentencing proceedings is consistent with this strategy of noncooperation.

Amaya-Ruiz, however, points to the state trial court's comment that the court did not know whether Amaya–Ruiz was competent. Amaya–Ruiz argues this indicates the court had a bona fide doubt as to his competence.

This argument takes the court's comment out of context. Reading the entire transcript, it is clear the state trial court believed Amaya–Ruiz was competent and was intentionally attempting to disrupt the proceedings. Taken in context, the court's comments indicate the court believed no further evaluation was needed but wanted to give defense counsel time to calm Amaya–Ruiz.

■ Finally, Amaya–Ruiz points to the presentence report which, under the heading "Collateral Information," states:

> Pima County Jail records reflect that [Amaya–Ruiz] is thought to have a high capacity for violence, to be very unpredictable, and prone to deep depression. He has received medication....

Amaya-Ruiz argues this notation should have prompted an additional evaluation. For this argument, Amaya–Ruiz relies on *Moran v. Godinez,* 57 F.3d 690 (9th Cir.1994).

In *Moran,* we concluded the state trial court should have had a bona fide doubt as to Moran's competency. During a pretrial hearing, Moran stated he was under medication. He also had attempted suicide three months earlier and he told the state trial court that he wanted to fire his attorneys, plead guilty, and die. *Id.* at 695.

The present case is factually distinguishable. The indication of medication arose for the first time during the sentencing proceedings. By this time, the state trial court had observed Amaya–Ruiz throughout the pretrial and trial proceedings. Contrary to *Moran,* the court also had the benefit of two evaluations which indicated Amaya–Ruiz was a competent malingerer. In these circumstances, the notation in Amaya–Ruiz's presentence report that he was taking medication did not mandate an additional evaluation. *Cf. Sturgis v. Goldsmith,* 796 F.2d 1103, 1110 (9th Cir.1986); *see also United States v. Williams,* 998 F.2d 258, 267 (5th Cir.1993); *Miles v. Dorsey,* 61 F.3d 1459, 1474 (10th Cir.1995); *Galowski v. Berge,* 78 F.3d 1176, 1182 (7th Cir.1996).

Amaya–Ruiz also refers to information in his jail medical records indicating he was under the care of Doctor Cata, the jail psychiatrist; at times, he was taking sinequan, thorazine, navane, and mellaril; he engaged in other irrational behavior, such as banging his head on the cell door; and he allegedly made a second suicide attempt by cutting himself with a comb and a plastic spoon. This information, however, was not presented to the state trial court until the state post-conviction proceedings. We, therefore, do not consider whether this information should have prompted the state trial court to order an additional evaluation. *See Lewis,* 991 F.2d at 527.

In sum, the evidence before the state trial court did not require an additional evaluation during the pretrial, trial, or sentencing proceedings.

### B. Ineffective Assistance of Counsel

■ Amaya–Ruiz next argues his trial counsel rendered ineffective assistance by failing to obtain his jail medical records and to present them to the state trial court during the trial and sentencing proceedings.

■ To prevail on this claim, Amaya–Ruiz first must establish that his " 'counsel's representation fell below an objective standard of reasonableness ... considering all the circumstances ... under prevailing professional norms.' " *Harris v. Wood,* 64 F.3d 1432,

1435 (9th Cir.1995) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984)). He must overcome a "strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making decisions." *Thompson v. Calderon,* 109 F.3d 1358, 1364 (9th Cir.1996) (internal quotations and citation omitted).

■ Amaya-Ruiz also must establish that prejudice resulted from the deficient performance. *Id.* at 1365. He must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

Pursuant to Kettlewell's request, the state trial court issued an order prior to trial requiring the jail to release to Kettlewell "all jail records" pertaining to Amaya–Ruiz. Kettlewell received the jail *incident* records, but did not receive the jail *medical* records. During the post-conviction proceedings, Kettlewell testified she learned in a later case that, to obtain the jail medical records, she was required to specifically request those records.

Kettlewell's failure to obtain the jail medical records does not amount to constitutionally deficient performance. Kettlewell reasonably assumed she had obtained all of Amaya–Ruiz's jail records, including all medical records, because the state trial court ordered the release of "all records." Also, Kettlewell testified during the post-conviction proceedings that a nurse at the jail would inform Kettlewell's office when an inmate was under psychiatric care, but the nurse did not notify her office that Amaya–Ruiz was seeing Doctor Cata. Clearly, Kettlewell's assumption was not "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066.

Because Amaya–Ruiz has not demonstrated that his counsel's conduct was constitutionally deficient, we need not consider the question of prejudice.

### C. Amaya-Ruiz's Confession

Amaya-Ruiz next argues his confession was involuntary and he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights.

At approximately 12:15 a.m., security officers for the railroad detained Amaya-Ruiz while he was trespassing and turned him over to the Border Patrol office in Yuma. While at the Border Patrol office Amaya-Ruiz presented a loaded gun to the Border Patrol, and Border Patrol Agent Merrill learned he was a suspect in Kimberly Lopez's murder. Agent Merrill then read Amaya-Ruiz his *Miranda* rights in Spanish and Amaya-Ruiz signed an acknowledgment form by making a mark. Amaya-Ruiz was placed in a cell and the police in Tucson were notified.

Police Detective Petropoulos of the Tucson police department arrived at the Border Patrol station in Yuma at approximately 8:30 that morning. Detective Petropoulos questioned Amaya-Ruiz with the help of Border Patrol Agent Rodriguez, who spoke Spanish. Before questioning him, the officers identified themselves and Amaya-Ruiz was read his *Miranda* rights again in Spanish. Amaya-Ruiz responded: "All right." "Yes, all right." and "Yes, all right, I do understand." He stated "No" when asked if he had any questions. When asked if he would answer questions, Amaya-Ruiz stated: "I don't know if I will answer ... ask me something." Amaya-Ruiz initially denied all knowledge of the murder, but then confessed to the murder.

Amaya-Ruiz argues the atmosphere of his questioning was coercive because, during the questioning, he was wearing only a blanket and underwear; he had been detained since 12:15 a.m. and was not questioned until 9:30 a.m.; and he had not slept or had anything to drink or eat during the night.

Amaya-Ruiz also contends the interrogating officers made coercive statements by encouraging him to tell the truth. One interrogating officer stated: "We can forgive your lies, but the United States Court system will not forgive your lies." In Amaya-Ruiz's presence, one officer said to another: "if he wants any forgiveness, he should tell the truth;" and "if he lies to us now it will be on the record for the rest of his life that he lied, and then he'll never be able to say he was sorry because he lied at this time."

In addition, Amaya-Ruiz argues the interrogating officers lied to him by misrepresenting that a witness had seen him leaving the Lopez's stolen truck and they preyed on his lack of intelligence and education.

### 1. Voluntariness

■ The test for determining whether a confession is voluntary is "whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir.1990) (internal quotations and citations omitted).

■ The atmosphere surrounding the questioning of Amaya-Ruiz was not coercive. The officers were entitled to detain Amaya-Ruiz based on their correct belief that he was an illegal alien. *See id.* at 819. The questioning lasted only forty minutes, the cell had a bench on which Amaya-Ruiz could sleep, Agent Merrill offered him something to eat or drink at approximately 5:30 a.m., Agent Rodriguez believed Amaya-Ruiz had been given coffee and a sandwich during his detention, neither officer who interrogated Amaya-Ruiz carried a weapon, and the officers's voices were calm and not threatening. Also, taking Amaya-Ruiz's bloodstained clothing and providing him with a blanket was not coercive; the officers suspected the clothing had evidentiary value. *See Greenawalt v. Ricketts*, 943 F.2d 1020, 1027 (9th Cir.1991).

Encouraging Amaya-Ruiz to tell the truth also did not amount to coercion. *See United States v. Leon Guerrero*, 847 F.2d 1363, 1366–67 (9th Cir.1988). The officers' statements were not "sufficiently compelling" to overbear Amaya-Ruiz's will. *Id.* at 1366; *see also United States v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir.1993); *Martin v. Wainwright*, 770 F.2d 918, 926 (11th Cir. 1985), *as modified by*, 781 F.2d 185 (11th Cir.1986).

■ The officers' misrepresentation that a witness had seen Amaya–Ruiz leaving the stolen truck does not amount to coercion. Misrepresentations linking a suspect to a crime or statements which inflate the extent of evidence against a suspect do not necessarily render a confession involuntary. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969); *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir.1993); *Holland v. McGinnis*, 963 F.2d 1044, 1051–52 (7th Cir.1992); *see also Shedelbower v. Estelle*, 885 F.2d 570, 574 (9th Cir. 1989).

■ Finally, because Amaya–Ruiz has not established that his confession was the product of coercion, his alleged lack of intelligence and education does not render his confession involuntary. *See Derrick*, 924 F.2d at 818.

2. Waiver of *Miranda* Rights

■ The state trial court's finding that Amaya–Ruiz knowingly and intelligently waived his *Miranda* rights is entitled to a presumption of correctness. *Id.* at 823. The record supports this finding. Amaya–Ruiz was read his *Miranda* rights in Spanish on two occasions before he was questioned. He stated he understood those rights. Further, during the interrogation, there is no indication that he displayed any signs of incompetency.

In sum, Amaya–Ruiz's confession was voluntary and he voluntarily, knowingly, and intelligently waived his *Miranda* rights.

D. Absence During Mitigation/Aggravation Hearing

■ Amaya–Ruiz argues he did not voluntarily, knowingly, and intelligently waive his right to be present during his mitigation/aggravation hearing. We reject this argument.

Amaya-Ruiz was brought into the courtroom in shackles for the mitigation/aggravation hearing. At the very beginning of the hearing, the following exchange occurred:

AMAYA-RUIZ (AR): I want these to be taken off. I am not going to be here tied up. You can take me out of here. I'm not going to be tied up.

COURT: You be quiet a moment and I will explain your rights to you. You have to remain in the courtroom.

AR: I want to know if you are going to take them off or not.

COURT: You have a right to remain in the courtroom if you wish. If you create— if you act out and create interruptions of the proceedings which are being held for your benefit, this is the time we are going to have a sentencing hearing as is required by law, at which time your attorney wants to put on some evidence to show mitigation. You will only be hurting yourself if you act out and do not want to stay and hear what is going on.

Now, if you make it impossible to have a regular court proceeding, I will have no choice but to remove you from the courtroom,

AR: I am not going to be tied up. I want you to take these off.

COURT: Do counsel for the defendant think you can go ahead with him in the courtroom in handcuffs?

KETTLEWELL (K): If I can have a moment, Your Honor.

COURT: All right.

AR: If she doesn't take these off, let her remove me. I am not going to be here like this.

COURT: Is it your opinion we should remove him?

K: I would ask that he be removed from the courtroom if the court feels that he has adequately been informed of his rights not to be here.

AR: Yes. I am not going to be tied up. Take me out.

COURT: Does the State feel he is adequately advised to be present?

STATE: Yes, ma'am.

COURT: Very well. Please remove the defendant.

Amaya-Ruiz was then removed and the mitigation/aggravation hearing was held. Amaya–Ruiz was brought back into court that afternoon and the state trial court sentenced him to death.

Amaya-Ruiz could waive his right to be present during the mitigation/aggravation hearing if the waiver was made voluntarily, knowingly, and intentionally. *See Campbell v. Wood,* 18 F.3d 662, 672 (9th Cir.1994). In determining whether Amaya–Ruiz waived this right, we "must indulge every reasonable presumption against the loss of the constitutional right to be present. . . ." *Id.*

The state trial court told Amaya–Ruiz that he had a right to be present during the hearing and explained the nature of the proceeding by stating that the hearing was a sentencing hearing during which his counsel would present mitigating evidence. The state trial court also told Amaya–Ruiz that he would only be hurting himself by not attending the hearing. Further, Kettlewell testified during the post-conviction proceedings that, during the sentencing hearing, she tried to convince Amaya–Ruiz to stay and she was "sure [she] was able to tell him, in terms that he could understand, why it was important to him to be [there]." Amaya–Ruiz, however, insisted on being removed from the hearing because he did not want to be shackled. His waiver was made voluntarily, knowingly, and intelligently. *Cf. id.* at 672–73.

AFFIRMED.