USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1425

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 KEVIN CONLEY,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 Wellford,* Senior Circuit Judge,
 and Selya, Circuit Judge.
 

 J. Bradford Coffey, with whom Farrell, Rosenblatt & Russellwas on brief, for appellant.
 Jennifer Zacks, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief, for the
United States.

September 11, 1998

 
 
_______________
*Of the Sixth Circuit, sitting by designation. SELYA, Circuit Judge. In this criminal appeal,
defendant-appellant Kevin Conley asks us to set aside his
conviction for conspiring to possess marijuana with intent to
distribute, see 21 U.S.C. 841(a)(1), 846 (1994), on the ground
that the admission into evidence of certain statements which he
made at the time of his arrest violated his Fifth Amendment rights. 
We reject the appellant's Fifth Amendment construct, as well as his
claim that the lower court erred when imposing sentence. 
Consequently, we affirm the judgment below.
I. BACKGROUND
 During the summer of 1995, postal inspectors received
information that sizable quantities of marijuana were being shipped
from San Diego, California, to central Massachusetts. When the
postal inspectors launched an investigation, a series of packages
addressed to one Richard Simms at 5 Valley St., Webster,
Massachusetts, aroused their suspicions; Simms did not live at 5
Valley St. and the packages bore apocryphal return addresses. To
further their probe, the postal inspectors monitored the delivery
of one such package to the Valley St. address. An individual named
Jeffry Taberski signed for it on October 19, 1995.
 In November 1995, a narcotics-sniffing dog detected drugs
in another parcel headed for 5 Valley St. The postal inspectors
obtained a warrant authorizing them to intercept and open that
package. Upon finding that it contained marijuana, the inspectors
resealed it and effected a controlled delivery. When Taberski
signed for this parcel, the postal inspectors immediately arrested
him.
 Taberski told the lawmen that he worked for "Kevin C." as
a receiver of shipments. He also informed them that, shortly
before his arrest, he had advised "Kevin" of the package's imminent
arrival and had been told that "Kevin" would retrieve it the next
day (November 8, 1995).
 Postal inspectors Michael Blanchard and William Kezer
returned to 5 Valley St. on November 8. At around 8:30 a.m., the
appellant arrived. Blanchard confronted him at the door to the
apartment. When the appellant identified himself as Kevin Conley,
Blanchard asked him to step inside and proceeded to arrest him. A
brief exchange followed, during which Blanchard searched the
appellant, unearthing $500 in cash. The appellant identified the
cash as his and asked Blanchard why he had been detained. 
Blanchard replied that he had been arrested for drug trafficking. 
After this colloquy, Blanchard read the appellant his Mirandarights. See Miranda v. Arizona, 384 U.S. 436 (1966).
 The appellant became increasingly nervous and openly
pondered calling an attorney. At that point, Inspector Kezer
reentered the apartment. He and Blanchard discussed searching
Conley's home, but decided to wait for a warrant. Without
prompting, the appellant consented to the search and stated that
the postal inspectors might find some cash and a small amount of
marijuana. Blanchard and Kezer told Conley that they would await
a warrant.
 Soon thereafter, the appellant spontaneously exclaimed: 
"Well, geez, you know, maybe I think I should get an attorney." 
Blanchard and Kezer decided to treat this rumination as a request
for counsel and told the appellant that they would not question him
until he had secured legal representation. The postal inspectors
attempted to locate a telephone book to assist the appellant in
selecting a lawyer, but they were unable to find one. Kezer again
left the apartment, but the appellant renewed his inquiries,
beseeching Blanchard to tell him "what is going on" and "what have
you guys got on me, what's this all about?" Blanchard reminded the
appellant that he had requested an attorney and that this
circumstance prevented the postal inspectors from entering into a
dialogue with him. When Conley nonetheless persisted, Blanchard
stated that if he (Blanchard) were to speak further, the appellant
could not reply. Conley readily agreed to this condition.
 Blanchard then limned the facts, mentioning other
packages sent to other addresses. When he stated that a "Mr.
Kubiak" had received some of these bundles, the appellant blurted
out that he had used Kubiak in marijuana deals. Blanchard
continued his recital, remarking that the postal inspectors knew
the marijuana originated from the San Diego area but did not know
the source. The appellant again interjected, this time recounting
that he had lived in southern California for a spell and that it
was quite easy to obtain marijuana there.
 In due season, a federal grand jury indicted the
appellant for possession with intent to distribute marijuana on
nine separate occasions and conspiracy to commit that substantive
offense. In advance of trial, the appellant moved to suppress in
gross the incriminating statements that he had made at the time of
his arrest. Judge Woodlock heard evidence and took the motion
under advisement. He later refused to suppress the challenged
statements and the government introduced some of them at trial
(over the appellant's renewed objection).
 The prosecution's case against the appellant was very
strong, consisting of the inculpatory statements, the postal
inspectors' observations, testimony from Taberski and Kellie Wright
(who swore that her boyfriend, John Womack, had sent marijuana
through the mail from San Diego to names and addresses in
Massachusetts specified by the appellant), and considerable
documentary evidence (e.g., mail tracking slips, telephone bills,
and records of money transfers that Conley had made by wire to
Womack and Taberski). Conley's defense centered around his claim
that he was an innocent dupe who had done nothing more than allow
Kubiak and Taberski to use his telephone. The jury returned a
split decision, finding the appellant guilty on the conspiracy
count but acquitting him on the nine substantive counts.
 At the disposition hearing, Judge Woodlock adjusted the
appellant's guideline sentencing range (GSR) upward for, interalia, drug quantity and role in the offense. He then imposed a
ninety-six month incarcerative sentence, a fine, and a four year
period of supervised release. This appeal followed.
II. THE SUPPRESSION MOTION
 In the appellant's view, the lower court should have
suppressed his incriminating statements because those statements
were obtained without proper deference to his request for counsel. 
This argument draws its essence from Edwards v. Arizona, 451 U.S.
477 (1981), a landmark decision in which the Supreme Court held
that, once a suspect who is in custody invokes his right to confer
with an attorney, continuing to interrogate him offends the
Constitution. See id. at 484-85. The government replies that no
Edwards violation occurred for two reasons: first, the inspectors
did not interrogate the appellant after he invoked his right to
counsel, and, moreover, the appellant himself initiated the pivotal
conversations. In sifting through these contentions, we review
the district court's findings of fact for clear error, while
affording de novo review to the court's ultimate legal and
constitutional conclusions. See United States v. Schaefer, 87 F.3d
562, 565 (1st Cir. 1996); United States v. Zapata, 18 F.3d 971, 975
(1st Cir. 1994).
 We begin with constitutional bedrock. Absent special
advisories by the police including advice about the right to
remain silent and the right to consult with counsel the Fifth
Amendment renders inadmissable most statements obtained by law
enforcement officers during custodial interrogation. See Miranda,
384 U.S. at 478-79. An arrest is the classic example of Miranda's
conception of custody, see id. at 444, and the appellant's arrest
is not disputed here. The critical question, then, is whether the
challenged statements were the product of interrogation, as that
word is understood in constitutional jurisprudence. If not, no
constitutional violation occurred; but if so, we must consider
whether such interrogation transpired only after the appellant
reinitiated the discussion. See Edwards, 451 U.S. at 484-85
(stating that once an accused "expresse[s] his desire to deal with
the police only through counsel, [he] is not subject to further
interrogation by the authorities until counsel has been made
available to him, unless the accused himself initiates further
conversations with the police") (emphasis supplied).
 To the extent that the appellant accuses Blanchard and
Kezer of not respecting his request for an attorney, the record
belies his claim. Although the appellant's comments on the subject
of whether he wanted an attorney were elliptical, the postal
inspectors exercised commendable restraint and chose to treat them
as a request for legal representation. At that moment, they not
only declined to question Conley further, but also advised him of
their position. This conduct fully satisfies the strictures of
Miranda and Edwards.
 The appellant next posits that Inspector Blanchard's
comments regarding the facts of the case and the strength of the
evidence constituted proscribed interrogation under the Edwardsregime. We do not agree.
 Interrogation, properly understood, involves either
"express questioning or its functional equivalent." Rhode Islandv. Innis, 446 U.S. 291 (1980). Accordingly, interrogation
encompasses "any words or actions on the part of the police (other
than those normally attendant to arrest and custody) that the
police should know are reasonably likely to elicit an incriminating
response from the suspect." Id. at 301. Blanchard's words and
actions do not fit this definition. To the contrary, he told the
appellant in the most straightforward terms that all interrogation
had to cease due to the request for legal representation.
 The statements that Blanchard made after that disclaimer,
objectively viewed, were not reasonably likely to elicit a response
from the appellant; indeed, Blanchard explicitly told the appellant
not to reply. A law enforcement officer's mere description of the
evidence and of potential charges against a suspect, in direct
response to the suspect's importuning, hardly can be classified as
interrogatory. See, e.g., United States v. Trimble, 986 F.2d 394,
401 (10th Cir. 1993); United States v. Payne, 954 F.2d 199, 203
(4th Cir. 1992); United States v. Jackson, 863 F.2d 1168, 1172 (4th
Cir. 1989). Furthermore, as we read the record, the appellant's
remarks during the course of Blanchard's narrative appear to have
been spontaneous utterances, uncoerced by any vestige either of
artifice or of official interrogation. Edwards does not bar the
introduction into evidence of spontaneous utterances merely because
the utterances occur subsequent to the accused's invocation of his
right to counsel. See, e.g., Shedelbower v. Estelle, 885 F.2d 570,
573-74 (9th Cir. 1989); United States v. De La Luz Gallegos, 738
F.2d 378, 381 (10th Cir. 1984).
 If more were needed and we do not think that it is no
Edwards violation occurred regardless of how Blanchard's statements
are characterized, inasmuch as the appellant himself prompted
Blanchard's recitation of the facts and the potential charges. By
repeatedly asking "what's this all about?" after he had requested
a lawyer, the appellant expressed an insatiable desire to reignite
the dialogue and he persisted in his attempt to do so even after
Blanchard reminded him of his right to an attorney. In such a
situation, the suspect, having himself initiated the resumed
discussion, cannot later be heard to claim that the officers, by
doing his bidding, abridged his rights. See Oregon v. Bradshaw,
462 U.S. 1039, 1045-46 (1983); Trimble, 986 F.2d at 401.
 In a rather lame effort to avoid the force of these
precedents, the appellant suggests that another event the postal
inspectors' discussion about searching Conley's abode induced the
appellant's questions and subsequent statements. This is nothing
more than wishful thinking. A discussion between two law officers
about the prospects for a search incident to an arrest is not so
likely to elicit an incriminating response as to come within the
Innis proscription.
 We need not paint the lily. The record amply supports a
finding that the appellant was not subjected to any interrogation
after he invoked his right to counsel, and that he, not the postal
inspectors, initiated the discussions which followed that request. 
That being so, the district court properly admitted the challenged
statements into evidence. See Shedelbower, 885 F.2d at 573-74; De
La Luz Gallegos, 738 F.2d at 381.
 As a last gasp, the appellant argues that, even if there
is no Edwards violation, there is a Miranda violation because
Blanchard interrogated him before the postal inspectors
administered the requisite warnings. To be specific, he
asseverates that the question concerning the ownership of the money
found in his wallet was asked in violation of Miranda and thus
tainted all subsequent admissions. In this respect, the appellant
relies on Pope v. Zenon, 69 F.3d 1018 (9th Cir. 1995), in which the
defendant, who had not yet received Miranda warnings, identified
his signature, thus incriminating himself and opening the door to
further queries regarding the crimes at issue. See id. at 1021.
 The appellant's attempted analogy between the
authorities' question regarding the cash found on his person during
the arrest and the officers' inquiries about the signature in Popeis flawed. In Pope, the document bearing the accused's signature
came from the scene of the crime and immediately implicated the
writer. See id. at 1023. Here, however, no such implication
attaches to Conley's ownership of the money (which turned out to be
a non-issue at trial). Moreover, Blanchard's question in this case
was much more of an informational inquiry incident to the arrest,
as opposed to a query designed to induce an inculpatory remark.
 To clinch matters, even if the appellant's affirmative
response to the inspector's question about the cash amounted to
self-incrimination, the mere fact that unwarned custodial
questioning has occurred does not, by itself, taint all subsequent
admissions. Oregon v. Elstad, 470 U.S. 298 (1985), stands squarely
for the proposition that, although the accused's direct response to
unwarned interrogation must be suppressed, the admissibility of any
admission made after Miranda warnings are administered "should turn
. . . solely on whether [such statement] is knowingly and
voluntarily made." Id. at 309. We find no indication here that
the appellant's answer to this single question, or the
circumstances in which it was posed, had an impermissibly coercive
effect. Indeed, the record reveals quite clearly that the
appellant's subsequent statements about his involvement in the
marijuana enterprise were entirely voluntary. Thus, this
assignment of error falters. See id. at 314-16.
III. THE SENTENCE
 The appellant protests two upward adjustments fashioned
by the district court in shaping the GSR. We address the two
adjustments separately, mindful that appellate tribunals review a
sentencing court's factual determinations under a deferential
standard and uphold those determinations unless they are clearly
erroneous. See United States v. St. Cyr, 977 F.2d 698, 701 (1st
Cir. 1992). Questions of law, of course, engender plenary review. 
See id.
 A. Drug Quantity.
 Under the sentencing guidelines, drug quantity bears a
direct correlation to the GSR (and, therefore, to the length of a
defendant's sentence). See United States v. Sepulveda, 15 F.3d
1161, 1196-97 (1st Cir. 1993). Here, Judge Woodlock credited
statements made by the appellant's supplier, Womack, and included
as part of the appellant's relevant conduct, USSG 1B1.3 (1995),
the quantities of marijuana contained in thirteen packages shipped
by Womack at the appellant's express instruction (eight of which
were mailed to the 5 Valley St. address). The judge then added the
amounts of marijuana contained in two parcels that had been sent to
Kubiak. On this basis, the judge held the appellant responsible
for 91.3 kilograms of marijuana.
 The appellant's greatest grievance with this computation
is that it includes amounts of marijuana involved in counts on
which the jury declined to convict. This grievance is bootless. 
It is perfectly clear that a sentencing court can premise
sentencing determinations on "acquitted conduct" so long as the
court supportably finds, by a preponderance of the evidence, that
the defendant committed the acts in question. See United States v.
Watts, 117 S. Ct. 633, 637 (1997) (per curiam) (explaining that
"[a]n acquittal is not a finding of fact" and therefore "does not
preclude the government from relitigating the issue when it is
presented in a subsequent action governed by a lower standard of
proof") (citations and internal quotation marks omitted); United
States v. Berrios, 132 F.3d 834, 839 (1st Cir. 1998); United Statesv. Meade, 110 F.3d 190, 203 (1st Cir. 1997). That is precisely the
situation that confronts us here.
 The appellant makes two related arguments, but neither of
them need occupy us for long. First, he claims that he should not
be brought to book for a number of the transactions because he was
not the prime mover in this transcontinental marijuana-by-mail
scheme and had no involvement in most of its iterations. This
claim boils down to a credibility call, pure and simple. It is
settled beyond cavil that, in the sentencing phase of a criminal
case, credibility choices are within the exclusive province of the
district judge. See, e.g., Sepulveda, 15 F.3d at 1198; St. Cyr,
977 F.2d at 706. Here, Judge Woodlock certainly did not exceed his
authority in finding the appellant to be less believable than
Taberski, Womack, and Wright, and concluding that the appellant
bore responsibility for a broad array of misconduct.
 The appellant's second point is no more convincing. The
guidelines authorize inclusion in sentencing determinations of all
"reasonably forseeable acts and omissions of others in furtherance
of jointly undertaken criminal activity." USSG 1B1.3 (1995). 
Seizing on this language, the appellant questions whether the drug
quantity tabulated by the sentencing court squares with this
foreseeability requirement. This requirement exists, see, e.g.,
United States v. Garcia, 954 F.2d 12, 15 (1st Cir. 1992), but it
has no bearing here. A defendant simply cannot be heard to
complain that he could not reasonably foresee acts that he himself
engineered.
 B. Role in the Offense. The sentencing guidelines direct the enhancement of a
defendant's offense level by three levels if he serves as a manager
or supervisor of a criminal enterprise that either numbers five or
more participants (including the defendant) or is "otherwise
extensive." USSG 3B1.1(b) (1995). Apparently believing in the
venerable adage that the best defense is a good offense, the
appellant claims that the lower court erred not only in boosting
his offense level under this guideline, but also in failing to
decrease his offense level commensurate with his minor role in the
conspiracy. See USSG 3B1.2(b) (1995).
 The appellant's arguments on this point are close to
whimsical. We have declared, with a regularity bordering on the
echolalic, that barring a mistake of law and there is no hint of
any such mistake here "battles over a defendant's status . . .
will almost always be won or lost in the district court." United
States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995). Here, as in
most such cases, the assessment of the appellant's role in the
offense of conviction is factbound, and the facts solidly confirm
Judge Woodlock's conclusion that the appellant supervised a scheme
involving at least five participants. After all, the record
supports serial findings that Conley supplied addresses to Wright
and Womack, recruited Kubiak and Taberski as receivers for the
falsely addressed packages, and supervised their efforts. No more
is exigible for the three-level enhancement that the district court
imposed. See, e.g., United States v. Joyce, 70 F.3d 679, 683 (1st
Cir. 1995); United States v. Savoie, 985 F.2d 612, 616 (1st Cir.
1993). Moreover, because we uphold the enhancement for Conley's
managerial role, it follows inexorably that his participation in
the offense of conviction was not "substantially less culpable than
the average participant." USSG 3B1.2, comment. (backg'd). 
Because an upward adjustment for a managerial role is fundamentally
inconsistent with according the same individual, in respect to the
same offense, a downward adjustment for a minor or minimal role,
the district court did not err in failing to grant the appellant's
motion for reduction.
IV. CONCLUSION
 We need go no further. The record reveals, without
serious question, that the appellant was fairly tried and lawfully
convicted, based in part on incriminating (but voluntary)
statements that he made at the time of his arrest. He was then
sentenced in full accord with the applicable guidelines.

Affirmed.