Heriberto CONTRERAS, Petitioner,

v.

B. RICE, Respondents.

No. CV 97–2120–JGD(RC).

United States District Court, C.D. California.

May 7, 1998.

857

Heriberto Contreras, Blythe, CA, pro se.

Teresa G. Mann, Office of the Atty. General, Los Angeles, CA, for Respondents.

### ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CHAPMAN, United States Magistrate Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition for writ of habeas corpus and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner and counsel for respondents.

## REPORT AND RECOMMENDATION ON A STATE HABEAS CORPUS PETITION

This Report and Recommendation is submitted to the Honorable John G. Davies, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On January 23, 1992, in the Los Angeles County Superior Court, petitioner Heriberto Contreras was convicted by a jury of second degree murder in violation of California Penal Code ("P.C.") § 187(a). Lodged Documents ("Docs"), Exh. A; Clerk's Transcript ("CT") 115–116. The petitioner also pleaded guilty to driving with a suspended or revoked license in violation of California Vehicle Code ("V.C.") § 14601(a) and admitted two prior convictions for violating V.C. § 14601(a) within the past five years. Reporter's Transcript ("RT") 328:19–332:2. On March 27, 1992, the court sentenced the petitioner to fifteen years to life for the murder; however, the sentence on the Vehicle Code violation was stayed pursuant to P.C. § 654. CT 127–28.

The petitioner appealed his conviction to the California Court of Appeal, which affirmed the conviction in a reported opinion, *People v. Contreras*, 26 Cal.App.4th 944, 31 Cal.Rptr.2d 757 (1994).[1] The petitioner filed a petition for review in the California Supreme Court, which was denied on October 26, 1994. Docs, Exh. D.

On June 13, 1996, the petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was denied on March 19, 1997. Docs, Exh. C.

### II

The California Court of Appeal found the following facts and circumstances underlying the petitioner's conviction:[2] A child died as a result of injuries sustained in a traffic colli-sion on February 10, 1991. The collision occurred when a tow truck driven by the petitioner rear-ended the vehicle in which the child was a passenger.

The People presented evidence establishing a pattern of reckless driving by bandit tow truck drivers in general and by the petitioner in particular. The petitioner had received numerous citations for traffic violations, had been arrested for reckless driving, had a prior accident, and actively was racing other tow truck drivers to an accident scene at the time of the fatal collision. Further, the evidence indicated the petitioner knew the brakes on his tow truck were not functioning properly on the day of the collision.

1. The prosecution's evidence.

Los Angeles police detective Stephen Bernard testified he investigates the operation of illegal tow truck drivers in the City of Los Angeles. These drivers, referred to as "bird-doggers" or "tow bandits," illegally monitor emergency calls on police scanners and race to accident scenes. The first driver to arrive at the scene has the pick of which disabled vehicle to tow. Competition is created by the fact an automotive repair shop will pay between $500 and $1,500 for damaged high-value cars. Bird-doggers generally have poor driving records.

Admitted bird-dogger Anthony Reedburg testified that the petitioner was his friend and employee. At the time of the accident in issue, Reedburg controlled 33 tow trucks working out of Empire Auto Restoration. The petitioner worked out of Harbor Tow which Reedburg also controlled. Reedburg testified body shops paid approximately $600 for damaged new cars but admitted he had received as much as $3,000 for a damaged vehicle.

a. The petitioner's prior violations.

On May 17, 1990, Los Angeles police officer Stephen Scallon saw the petitioner driving a blue Mustang at 58 miles per hour in a 35 mile per hour zone on Adams Boulevard.

---

1. This opinion was certified for partial publication. The complete Court of Appeal opinion is located at Docs, Exh. B.

2. *Contreras*, 26 Cal.App.4th at 947–53, 31 Cal. Rptr.2d 757.

Scallon cited the petitioner for speeding and for driving on a revoked or suspended license. The petitioner signed the citation.

On June 16, 1990, Los Angeles police officer Billy Holland saw the petitioner turn right onto Soto Street in a gray Volkswagen without stopping for the red light. The petitioner was approximately 15 seconds late for the light. Holland cited the petitioner for failing to stop at a red light, no driver's license in his possession, and lack of proof of insurance. The petitioner signed the citation.

On July 4, 1990, California Highway Patrol officer Melanie Nava saw a Chevrolet tow truck driven by the petitioner pass her on the freeway at approximately 90 miles per hour. Nava drove at 115 miles per hour to catch the truck and paced it at approximately 85 miles per hour. The petitioner "was traveling in and out, using all lanes of travel." Nava stopped the truck, advised the petitioner he had been driving recklessly, and told him he could be arrested for reckless driving. Nava cited the petitioner for speeding because traffic conditions were light. The petitioner signed the citation.

On September 11, 1990, Los Angeles police helicopter pilot Frank King noticed a tow truck speeding in a residential area at 50 to 60 miles per hour. The truck slowed down when it went through stop signs but never went less than 30 miles per hour. King thought the truck was stolen. Los Angeles police officer Cornell Greer received a radio broadcast from King and followed a tow truck driven by the petitioner on San Vicente Boulevard. The petitioner made numerous unsafe lane changes and followed vehicles too closely. When the truck stopped at an accident scene, Greer cited the petitioner for unsafe lane changes, following too closely, and not wearing a seat belt. Greer noted on the citation that the petitioner's driving had nearly caused several traffic accidents. Greer told the petitioner his driving could have resulted in an arrest for reckless driving.

On September 17, 1990, at 10 a.m., Culver City police detective Maurice Vidican was stopped at a red light at Jefferson Boulevard and Overland Avenue in an unmarked police vehicle. Vidican noticed a tow truck approach from behind and enter the right-turn-only lane as if it were going to turn south. Vidican proceeded as the light changed but "the tow truck shot . . . directly in front of me." Vidican had to slam on his brakes to avoid hitting the truck. Vidican followed the truck, which was traveling at speeds between 90 and 100 miles per hour on Jefferson Boulevard and weaving in and out of traffic. Vidican radioed for assistance and identified the petitioner when other officers stopped the truck at an accident scene at Jefferson and La Cienega Boulevards. The petitioner was arrested for reckless driving.

Also on September 17, 1990, at 4:40 p.m., Inglewood police officer Jeffrey Steinhoff was traveling northbound on La Cienega Boulevard at La Tijera Boulevard when he heard a report of a traffic accident. He saw a fire truck driving toward the accident followed by a tow truck "going from lane to lane" and traveling at 65 to 70 miles per hour. At the accident scene, the tow truck stopped in the southbound lanes of La Tijera, turned on its emergency lights, and made a U-turn crossing double yellow solid lines and "causing the northbound traffic to come to a sudden halt." The petitioner stopped next to the accident and held up traffic. Steinhoff cited the petitioner for an unsafe U-turn and no driver's license in his possession. Steinhoff discussed with the petitioner the near collision petitioner had caused.

On October 6, 1990, Renon Baker, a private citizen, noticed a tow truck tailgating her vehicle. The truck sped past her at 55 to 60 miles per hour. Ahead of them, a passenger vehicle rolled through a stop sign in an attempt to "beat the tow truck. [¶] But the tow truck was going too fast, and . . . hit him." The passenger vehicle was pushed onto the sidewalk. Contreras told Baker, "I know I was going too fast."

On January 18, 1991, Los Angeles police officer William Rugh saw the petitioner driving a tow truck westbound on Slausen Avenue traveling in excess of 70 miles per hour in a 35 mile per hour zone and passing other vehicles. Rugh advised petitioner his driving was reckless and could kill someone. Rugh

cited the petitioner for speeding and the petitioner signed the citation.

Los Angeles police officer Ellen Perez testified that on February 7, 1991, she saw a tow truck driven by petitioner go through a red light on Manchester Boulevard. The petitioner was 15 feet late for the light and was traveling at 40 to 45 miles per hour. Perez cited the petitioner for failing to stop for a red light and driving with a suspended driver's license. The petitioner signed the citation.

On January 19, 1991, Los Angeles police officer Robert Di Paolo issued petitioner a Department of Motor Vehicles form formally advising petitioner that his license had been suspended or revoked and he could not operate a motor vehicle in California. The petitioner signed the form in Di Paolo's presence.

Roger Muro, a principal hearing officer with the Department of Motor Vehicles, testified that on February 10, 1991, the petitioner's driver's license remained suspended.

b. Reedburg's trial testimony.

On February 9, 1991, the petitioner drove his truck to Reedburg's house and told Reedburg, " 'Something [is] wrong with the brakes again on the truck. I need your truck.' " The petitioner borrowed Reedburg's truck and left.

The next morning, February 10, 1991, Reedburg drove the petitioner's truck to Empire Auto Restoration. Reedburg testified, "[Y]ou couldn't go 30 miles an hour in the truck and stop, ... [¶] The truck didn't have no [sic] brakes." The brake pedal went all the way to the floorboard.

The petitioner arrived at the shop at 8 a.m. and asked about his brakes. Reedburg told him they were "no good." The petitioner answered, " 'Yeah, that's why I brought the truck to you, so you can get it taken care of.' " Reedburg told the petitioner that the truck could be driven no more than 10 or 15 miles an hour and "if you got behind anybody, that you would have a wreck."

Contreras returned one hour later. Although Contreras's truck had been moved to an area normally reserved for repaired vehi-

cles, Reedburg told the petitioner that the truck was not ready. The petitioner became angry and left in Reedburg's truck. He returned at approximately 10 a.m.

At the preliminary hearing, Reedburg testified he was with the petitioner between 9:30 a.m. and noon waiting for a mechanic to arrive to fix the brakes. When an accident report came over the police scanner, about 10 drivers, including the petitioner, "took off."

At trial, Reedburg testified the petitioner left Empire Auto Restoration and returned a third time at approximately 11:30 a.m. The accident call came in shortly after petitioner returned and before Reedburg had a chance to tell petitioner that the brakes had not yet been fixed.

Under both accounts, the petitioner had the keys to Reedburg's truck but took the keys to his own truck and left in it in response to the accident report. Reedburg was unable to stop the petitioner and had not told petitioner his brakes had been fixed. Reedburg tried to call the petitioner on the radio but could not reach him.

Reedburg heard about an accident at 54th Street and Denker Avenue over the radio and went to the scene. The petitioner was crying and told Reedburg the brakes had failed. The petitioner left the scene with another tow truck driver but returned when Reedburg radioed to him. In a telephone conversation two or three weeks before the trial, the petitioner told Reedburg not to say Contreras knew the brakes were bad.

Reedburg further testified that the petitioner could not receive the radio call regarding the brakes because the radio in Contreras's truck was inoperable. However, in a statement to Officer Jiminez taken April 12, 1991, which Reedburg read and signed, Reedburg said the radio was on and working in the petitioner's truck before and after the accident. Reedburg told Jiminez he heard petitioner's radio receiving broadcasts at the scene of the accident.

Approximately one year before the accident, Reedburg had been a passenger in a tow truck driven by the petitioner. Reedburg made the petitioner pull over and Reed-

burg insisted on driving. He told petitioner "he was likely to kill somebody driving the way he drives."

Reedburg testified he had never driven down Denker Avenue from Empire Auto Restoration, the route to the accident, without using his brakes.

#### c. Facts related to the fatal collision.

At approximately noon on Sunday, February 10, 1991, Charles Mason saw two tow trucks racing side by side north on Denker Avenue at 60 to 70 miles per hour. They hit a dip at 55th Street, went airborne and made screeching sounds when they landed but did not slow down. The tow truck driven by the petitioner rear-ended a car stopped at the red light at the intersection of 54th and Denker.

Margaret Ledlow heard the trucks "bottom out" at 55th Street and ran to her porch. She saw two tow trucks racing toward her "side-by-side down the street." The trucks were traveling at "freeway speed, 55 maybe 60 miles per hour, if not faster." The petitioner's truck, which was on the correct side of the street, hit a car stopped for a red light at 54th and Denker. The car "went up into the air" across the intersection and into a parked car. The driver of the other tow truck refused to assist and left the scene. The petitioner stayed and tried to help the victims.

The car struck by the petitioner was driven by Nadine Lashley, who was on her way home from Sunday school with 9–year–old Lalisa Stewart and 13–year–old Jerry Williams. Lashley and Stewart suffered various injuries and both were hospitalized. The parties stipulated Jerry Williams died on February 10, 1991, as a result of the injuries received in the collision. The speed limit on Denker Avenue is 25 miles per hour.

#### 2. Defense.

Los Angeles police officer Richard Haberland, an accident reconstruction expert, investigated the fatal accident and estimated the truck had been traveling at a minimum speed of 47.7 to 54 miles per hour when the front wheels locked, based on the 177.5 feet of skid marks at the scene. Haberland opined, had the truck's brakes been working properly, there was a 75 percent chance the truck would have stopped before impact.

On cross-examination, Haberland testified he had given the petitioner the benefit of every doubt when estimating the coefficient of friction of the roadway and the tires and assumed the front wheels supply only 50 percent of the braking power of the vehicle. Also, Haberland assumed the rear brakes had not contributed at all to the deceleration of the truck and disregarded the energy consumed in the crush deformation of the vehicles in the crash. Each of these factors would increase the minimum speed calculation Haberland reached.

#### 3. Rebuttal.

Roger Newsock, senior staff analysis engineer for General Motors, inspected the brakes on the petitioner's 1990 Chevrolet truck. He found the front and the rear hydraulic systems and the front brakes were in good condition. However, the rear brakes were completely worn. Although average brake pedal movement is four and a half inches, the brake pedal on the petitioner's truck moved seven and a quarter inches when depressed.

### III

On July 25, 1995, the petitioner filed his first federal habeas corpus petition. Docs, Exh. E. It was dismissed without prejudice after the petitioner filed a motion to voluntarily dismiss the petition so he could exhaust his state court remedies.[3] Docs, Exh. E.

On April 1, 1997, the petitioner filed the instant habeas corpus petition. In the petition, the petitioner makes the following eight claims:

Ground 1—The petitioner was denied due process of law when County jail psychiatrists "knew [he] was suicidal, actively psychotic, hallucinating, and under the influence of

---

**3.** This dismissal does not make the instant habeas corpus petition a second or successive petition under 28 U.S.C. § 2244. *In re Turner,* 101 F.3d 1323 (9th Cir.1996).

heavy doses of psychotropic drugs while ... in court on criminal charges but nevertheless failed to inform the court or take any other measures to protect [his] right to be competent during criminal court proceedings." . Petition, 2:14–21; Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus ("Memorandum"), 18:1–19:11.

Ground 2—The "[p]etitioner was denied due process because he attended criminal court proceedings, consulted with counsel, and proceeded to stand trial while he was suicidal, actively psychotic, hallucinating, and under the influence of heavy doses of psychotropic drugs." Petition, 2:22–26; Memorandum, 19:12–22:18.

Ground 3—The petitioner was denied the effective assistance of counsel when his trial counsel, who knew that he was suicidal, hallucinating, actively psychotic and under the influence of psychotropic drugs, failed to (a) inform the court, (b) request a competency hearing, or (c) take any other measures to protect the petitioner's right to be competent during criminal proceedings. Petition, 2:27–3:6; Memorandum, 22:20–24:22.

Ground 4—The trial court, which "necessarily had a doubt as to [p]etitioner's mental competence to stand trial," acted in excess of its jurisdiction when it tried the petitioner without first holding a full competency hearing pursuant to P.C. § 1368. Petition, 3:7–12; Memorandum, 24:24–26:17.

Ground 5—The Court of Appeal's opinion effectively eliminates·the distinction between manslaughter and murder and, even if this distinction existed, there was insufficient evidence to determine that the petitioner acted with "conscious disregard for life." Petition, 3:13–22; Memorandum, 26:18–39:27.

Ground 6—The trial court erred in admitting irrelevant, highly prejudicial evidence. Petition, 3:23–25; Memorandum, 40:1–43:21.

Ground 7—The trial was tainted by numerous acts of prosecutorial misconduct. Petition, 3:26–27; Memorandum, 43:22–47:3.

Ground 8—The cumulative errors of the court and prosecutor require reversal of petitioner's conviction. Petition, 4:1–3; Memorandum, 47:4–49:11.

The respondents filed a return to the habeas corpus petition on July 7, 1997, and a supplemental return on August 6, 1997. On October 17, 1997, the petitioner filed a traverse. At the Court's order, the respondents lodged supplemental documents on November 25, 1997.

## DISCUSSION

### IV

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), effective April 24, 1996, worked substantial changes to the law of habeas corpus. *Moore v. Calderon,* 108 F.3d 261, 263 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). Of specific importance to the petitioner's claims are the revisions made to 28 U.S.C. § 2254(d), which now states that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim[¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In reviewing a habeas petition, a federal court shall presume that a determination of factual issues made by a state court is correct, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

◼ Since the claims raised in the instant petition were raised before the California Supreme Court, this Court must examine the California Supreme Court's decision, which is presumed to be on the merits even though it is without citation to authority or accompanied by a written opinion. *Hunter v. Aispuro,* 982 F.2d 344, 348 (9th Cir.1992), *cert. denied,* 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993); *Duncan v. Calderon,* 946 F.Supp. 805, 812 (C.D.Cal.1996). How-

ever, "[w]here there has been one reasoned state judgment rejecting a federal claim, [federal courts are to presume that] later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991). Thus, as to those claims addressed by the California Court of Appeal, this Court will consider the reasoning of the Court of Appeal in determining whether the California Supreme Court's decision is contrary to, or is an unreasonable application of, federal law.

■ The AEDPA also modified the circumstances under which a court may grant an evidentiary hearing on a state prisoner's habeas corpus petition, providing:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, [a district] court shall not hold an evidentiary hearing on the claim unless the applicant shows that—[¶] (A) the claim relies on—[¶] (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or [¶] (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). However, "[w]here ... the state courts simply fail to conduct an evidentiary hearing, the AEDPA does not preclude a federal evidentiary hearing on otherwise exhausted claims." *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir.1997).

## V

■ The petitioner's first and second claims are that he was not competent to stand trial. The conviction of a legally in-

competent defendant violates the due process clause of the Fourteenth Amendment. *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996); *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). As the Supreme Court recently stated:

Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper*, 116 S.Ct. at 1376–77 (quoting *Riggins v. Nevada*, 504 U.S. 127, 139–40, 112 S.Ct. 1810, 1817–18, 118 L.Ed.2d 479 (1992) (Kennedy, J., concurring in the judgment)). "[T]he standard for competence to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (per curiam)). "In a habeas proceeding, a petitioner is entitled to an evidentiary hearing on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court."[4] *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir.1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 860, 88 L.Ed.2d 899 (1986).

■ Here, the petitioner contends that he was incompetent at the time of his trial because he was "suicidal, actively psychotic, hallucinating, and under the influence of heavy doses of psychotropic drugs." Peti-

---

4. This Court recognizes that the AEDPA modified the circumstances under which a federal court may grant an evidentiary hearing on a state prisoner's habeas corpus petition. *See* 28 U.S.C. § 2254(e)(2). However, in this case, the petitioner presented the underlying factual bases of his claims, including the claim that he was incompetent to stand trial, to the California Supreme Court in his habeas corpus petition; therefore, Section 2254(e)(2) is not applicable to this claim. *Jones*, 114 F.3d at 1013.

tion, 2:22–26; Memorandum, 19:13–22:18. The medical records presented to the California Supreme Court show that on March 7, 1991, the petitioner attempted to hang himself; however there were "no visible physical injuries." Petition, Exh. D; Docs, Exh. C.[5] Moreover, the next day, the petitioner admitted he "faked" this suicide attempt because he did not want to be transferred to another cell block. Respondents' Supplemental Lodging, Exh. 7.[6] The medical records also show that on September 19, 1991, the petitioner actually did attempt to hang himself. Petition, Exh. D. At that time, the petitioner reported experiencing auditory and visual hallucinations, and burns were noted on the petitioner's neck. *Id.*

■ Although a genuine suicide attempt is very serious, not "every suicide attempt inevitably creates a [bona fide] doubt concerning the defendant's competency."[7] *United States v. Loyola–Dominguez*, 125 F.3d 1315, 1318–19 (9th Cir.1997). Since the petitioner's real suicide attempt on September 19, 1991, occurred more than *three months* before his trial, additional evidence, such as a history of irrational behavior, is needed to raise a "bona fide doubt" as to the petitioner's competency to stand trial. *See Drope*, 420 U.S. at 177–80, 95 S.Ct. at 907–08 (trial court required to hold a competency hearing when presented with testimony describing defendant's history of irrational behavior, including the testimony of the defendant's wife

that he tried to choke her to death just prior to trial, and given defendant's attempted suicide during trial); *Boag*, 769 F.2d at 1343 ("In cases finding sufficient evidence of incompetency, the petitioners have been able to show either extremely erratic and irrational behavior during the course of the trial ... or lengthy histories of acute psychosis and psychiatric treatment...." (citations omitted)). Here, the petitioner has shown no additional evidence of self-destructive behavior, either before or during his trial, and, despite some instances of the petitioner self-reporting hallucinations, the medical records generally describe the petitioner as "alert," "oriented," "calm," and/or "cooperative." Petition, Exh. D.

■ The medical records do show, however, that during the trial the petitioner was taking several medications, including Cogentin,[8] Navane,[9] Sinequan,[10] and Tofranil.[11] Petition, Exh. D. While the petitioner correctly points out that each of these, and other, medications may have serious side effects, he does not state that he experienced any side effects and the medical records do not show that he complained of suffering any side effects. Therefore, the mere fact that the petitioner was taking medications during his trial does not raise a "bona fide doubt" as to his competence to stand trial. *See Sturgis v. Goldsmith*, 796 F.2d 1103, 1109–10 (9th Cir.1986) (failure to present evidence of med-

5. Exhibit D attached to the habeas corpus petition and Exhibit C of the Documents lodged by respondents both contain the petitioner's Central Jail medical records. All further reference to these records will be to Exhibit D attached to the habeas corpus petition.

6. Exhibit 7 of the Respondents' Supplemental Lodging consists of medical records from the County of Los Angeles's Forensic Outpatient Program ("FOP"). Unlike the petitioner's Central Jail medical records, the FOP medical records were not presented to the California Supreme Court.

7. The term "real and substantial doubt" used in Boag describes the same constitutional standard as the term "bona fide doubt" used in Loyola–Dominguez and elsewhere. *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir.1991); *Chavez v. United States*, 656 F.2d 512, 516 n. 1 (9th Cir. 1981).

8. "Cogentin is an 'anticholinergic' medication, a drug that controls spasms." *The PDR Family Guide to Prescription Drugs*, 116 (5th ed.1997). "Cogentin is given to help relieve the symptoms of 'parkinsonism': the muscle rigidity, tremors, and difficulties with posture and balance that occur in Parkinson's disease and that sometimes develop as unwanted side effects of antipsychotic drugs...." *Id.*

9. "Navane is used to treat psychotic disorders." *Id.* at 382.

10. "Sinequan is used in the treatment of depression and anxiety. It helps relieve tension, improve sleep, elevate mood, increase energy, and generally ease the feelings of fear, guilt, apprehension, and worry most people experience." *Id.* at 536.

11. "Tofranil is used to treat depression." *Id.* at 585.

ication petitioner was taking or "how [the medication] might have affected his competence at trial" did not raise a bona fide doubt as to the petitioner's competency to stand trial).

■ Further, the petitioner has not cited, and the record does not show, one instance of petitioner acting irrationally during the pretrial or trial proceedings. To the contrary, when the trial court conversed with petitioner while taking his guilty plea for violating V.C. § 14601(a), the petitioner appropriately and directly answered the court's questions, and the trial court specifically found the guilty plea was knowingly and intelligently made. *See* RT 329:7–332:9. As reflected in the record, the trial court, who had an opportunity to converse with the petitioner and observe his demeanor, did not perceive reasonable cause to believe the petitioner was incompetent. *See Hernandez,* 930 F.2d at 718 (stating that it was significant that the trial judge had the opportunity to converse with the petitioner and observe his demeanor, yet concluded that his competence was not in serious doubt).

■ Finally and very importantly, the petitioner has not shown that he was unable to understand the nature of the proceedings against him or assist counsel; to the contrary, petitioner's trial counsel states that "[t]hroughout the proceedings ..., I had no doubt whatsoever that [the petitioner] was competent to stand trial.... [¶] At all critical times, [the petitioner] understood the charges against him. He also was able to assist me in preparation of his defense." Respondents' Supplemental Return, Declaration of Karen Thompson ("Thompson Decl.") ¶¶ 3–4. "While the opinion of [defense] counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings." *Hernandez,* 930 F.2d at 718; *See also United States v. Lewis,* 991 F.2d 524, 528 (9th Cir.) (stating that a defense counsel's silence on the petitioner's competency is some evidence that the petitioner showed no

signs of incompetence at that time), *cert. denied,* 510 U.S. 878, 114 S.Ct. 216, 126 L.Ed.2d 172 (1993).

Thus, when the record is viewed as a whole, the evidence does not raise a "bona fide doubt" as to the petitioner's competency to stand trial,[12] and the California Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, federal law.

## VI

■ The petitioner's fourth claim is that the trial court erred in failing to hold sua sponte a competency hearing for him. "The due process clause requires a state trial court to sua sponte inquire into a defendant's competency if 'a reasonable judge would be expected to have a bona fide doubt as to the defendant's competence.'" *Amaya–Ruiz v. Stewart,* 121 F.3d 486, 489 (9th Cir.1997) (quoting *Moran v. Godinez,* 57 F.3d 690, 695 (9th Cir.), *cert. denied,* 516 U.S. 976, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995)); *Loyola–Dominguez,* 125 F.3d at 1318. A bona fide doubt arises if there is substantial evidence of incompetence. *Amaya–Ruiz,* 121 F.3d at 489; *Moran,* 57 F.3d at 695; *Cacoperdo v. Demosthenes,* 37 F.3d 504, 510 (9th Cir.1994), *cert. denied,* 514 U.S. 1026, 115 S.Ct. 1378, 131 L.Ed.2d 232 (1995). Substantial evidence, for example, would include "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial...." *Drope,* 420 U.S. at 180, 95 S.Ct. at 908; *Amaya–Ruiz,* 121 F.3d at 489. "[E]ven one of these factors standing alone, may, in some circumstances, be sufficient" to give rise to a bona fide doubt regarding a defendant's competence. *Drope,* 420 U.S. at 180, 95 S.Ct. at 908; *Loyola–Dominguez,* 125 F.3d at 1318.

■ To determine whether the trial court had substantial evidence to give rise to a bona fide doubt as to the petitioner's competence, this Court will examine only the evidence before the trial court at the time of the pretrial, trial and sentencing proceed-

---

12. The petitioner further asserts that the County jail psychiatrists were duty bound to inform the trial court that the petitioner was incompetent. Petition, 2:14–21; Memorandum, 18:1–19:11.

However, since the petitioner has not provided evidence to establish a "bona fide doubt" as to his competency to stand trial, this claim also is without merit.

ings. *Amaya–Ruiz*, 121 F.3d at 489; *Lewis*, 991 F.2d at 527. On August 2, 1991, at the request of the petitioner's trial attorney, the trial court ordered the petitioner to undergo an evaluation under P.C. § 4011.6.[13] CT 23; Reporter's Transcript of August 2, 1991 Proceedings ("RT 8/2/91"), 10:1–5. On August 13, 1991, the trial court noted it "ha[d] read the [P.C. § 4011.6 report] from the Department of Mental Health[,] which indicates the [petitioner] does not meet the criteria as set by county jail forensic outpatient program and is returned to court." [14] CT 33.

Based on these events, the petitioner argues that the trial court necessarily had a bona fide doubt as to his competence to stand trial and, having such a doubt, the trial court was required to initiate mental competency proceedings under P.C. § 1368.[15] Petition, 3:7–12; Memorandum, 24:24–26:17. The petitioner is mistaken.

There is a significant difference between an evaluation under P.C. § 4011.6 and a competency hearing under P.C. § 1368. The former evaluation is performed when, as a result of a mental disorder, an inmate is deemed a "danger" to himself or others or is gravely disabled; a competency hearing is required if a doubt arises as to the mental competence of a criminal defendant. Here, the petitioner's trial attorney requested an evaluation under P.C. § 4011.6 because the petitioner had attempted suicide and she was worried about him. RT 8/2/91, 10:1–5; Thompson Decl. ¶ 5. The evaluation apparently reflected that a therapist determined the petitioner was not a danger to himself. Reporter's Transcript of August 13, 1991 Proceedings ("RT 8/13/91"), 1:19–24. The evaluation, thus, did not show that petitioner was not competent. Even if it had shown petitioner to be a danger to himself, that would not necessarily have been substantial evidence of incompetence to stand trial. The record, thus, does not show that the trial court should have entertained a "bona fide doubt" as to the petitioner's competency; therefore, the California Supreme Court's denial of this claim is neither contrary to, nor an unreasonable application of, federal law.

## VII

The petitioner's third claim is that his counsel was incompetent in failing to demand

---

13. P.C. § 4011.6 states, in pertinent part:

In any case in which it appears to . . . any judge of a court in the county in which the jail or juvenile detention facility is located, that a person in custody in that jail or juvenile detention facility may be mentally disordered, he or she may cause the prisoner to be taken to a facility for 72–hour treatment and evaluation pursuant to Section 5150 of the Welfare and Institutions Code and he or she shall inform the facility in writing, which shall be confidential, of the reasons that the person is being taken to the facility. . . . If a prisoner is detained in, or remanded to, a facility pursuant to those articles of the Welfare and Institutions Code, the facility shall transmit a report, which shall be confidential, to the person in charge of the jail or juvenile detention facility or judge of the court who caused the prisoner to be taken to the facility and to the local mental health director or his or her designee, concerning the condition of the prisoner. A new report shall be transmitted at the end of each period of confinement provided for in those articles, upon conversion to voluntary status, and upon filing of temporary letters of conservatorship.

W.I.C. § 5150 states, in pertinent part:

When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72–hour treatment and evaluation.

14. Unfortunately, the actual evaluation has been lost and is not a part of the record before this Court. Declaration of Teresa G. Mann, attached to the Respondents' Supplemental Lodging of Documents; Declaration of Wesley A. Van Winkle, attached to Docs, Exh. C.

15. P.C. § 1368(a) states, in pertinent part:

If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . At the request of the defendant or his counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.

a competency hearing for him. There is no merit to this claim since, as discussed above, the petitioner has not shown that he was not competent to stand trial.

To establish a prima facie claim of ineffective assistance of counsel, the petitioner must demonstrate that his trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *James v. Borg*, 24 F.3d 20, 27–8 (9th Cir.), *cert. denied*, 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994). The petitioner bears the burden of establishing both components. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *United States v. Quintero–Barraza*, 78 F.3d 1344, 1348 (9th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996). "Deficient performance is performance which is objectively unreasonable under prevailing professional norms." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir.1990)(citing *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064). Prejudice "focuses on the question whether counsel's deficient performance renders the results of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

In reviewing trial counsel's performance, the court will "strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." *Hughes*, 898 F.2d at 702 (citing *Strickland*, 466 U.S. at 689–90, 104 S.Ct. at 2065–66); *United States v. Palomba*, 31 F.3d 1456, 1460–61 (9th Cir.1994). Only if counsel's acts or omissions, examined within the context of all the surrounding circumstances, were outside the "wide range" of professionally competent assistance, will the petitioner meet this initial burden. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2068; *Quintero–Barraza*, 78 F.3d at 1348.

If the petitioner makes this showing, he must then establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067. The errors must not merely undermine confidence in the outcome of the trial, but must result in a proceeding that was fundamentally unfair. *Lockhart*, 506 U.S. at 369, 113 S.Ct. at 842–43; *Quintero–Barraza*, 78 F.3d at 1348.

■ The petitioner argues that he was denied the effective assistance of counsel when his counsel knew he "was suicidal, actively psychotic, hallucinating, and under the influence of heavy doses of psychotropic drugs but nevertheless failed to inform the court, request a competency hearing or take other measures to protect Petitioner's right to be competent during criminal court proceedings." Petition, 3:1–6. Here, the record shows that the petitioner's counsel requested an evaluation under P.C. § 4011.6 because she was worried about him. RT 8/2/91, 10:1–5; Thompson Decl. ¶ 5. This evaluation, however, showed that the petitioner was not a danger to himself. RT 8/13/91, 1:19–24. Additionally, the petitioner was able to assist defense counsel in preparing his defense, and defense counsel had no doubt as to petitioner's competence to stand trial. Thompson Decl. ¶¶ 3–4.

■ Based on the lack of evidence that the petitioner was incompetent to stand trial, his attorney's failure to request a competency hearing under P.C. § 1368 did not fall outside the wide range of professionally competent assistance. Counsel is not obligated to raise frivolous motions, and failure to do so cannot constitute ineffective assistance of counsel. *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir.), *cert. denied*, 513 U.S. 1001, 115 S.Ct. 513, 130 L.Ed.2d 420 (1994). Moreover, since this Court has determined that no bona fide doubt arose regarding the petitioner's competence to stand trial, the petitioner is unable to establish that he was prejudiced by the failure to hold a competency hearing. *Boag*, 769 F.2d at 1344. Thus, the California Supreme Court's denial of the petitioner's ineffective assistance of counsel claim is neither contrary to, nor an unreasonable application of, federal law.

## VIII

■ The petitioner also contends, in his fifth claim, that the California Court of Ap-

peal's opinion eliminates the distinction between vehicular manslaughter and murder under California law. However, this claim, which is based solely on the claimed misapplication of California law, is not cognizable in a federal habeas corpus proceeding. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986).

■ The petitioner further contends that there was insufficient evidence to sustain a finding that he acted with a "conscious disregard for life or an abandoned and malignant heart." Petition, 3:18–22; Memorandum, 35:13–39:27. That is, the petitioner contends that "evidence of the mental element required for a second-degree murder verdict—malice aforethought—was simply not present." Memorandum, 37:8–10.

The California Court of Appeal, in addressing this claim, found that the evidence

> establish[ed] a pattern of reckless driving by bandit tow truck drivers in general and by [the petitioner] in particular. [The petitioner] had received numerous citations for traffic violations, had been arrested for reckless driving, had a prior accident, and actively was racing other tow truck drivers to an accident scene at the time of the fatal collision. Further, the evidence indicated [the petitioner] knew the brakes on his tow truck were not functioning properly on the day of the collision.

*Contreras*, 26 Cal.App.4th at 947, 31 Cal. Rptr.2d 757.

To review the sufficiency of the evidence in a habeas corpus proceeding, the court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). All evidence must be considered in the light most favorable to the prosecution. *Id.* These standards are applied to the substantive elements of the criminal offense defined by state law. *Id.* at 324 n. 16, 99 S.Ct. at 2792 n. 16.

■ Under California law, "[m]anslaughter is the unlawful killing of a human being without malice." P.C. § 192. Whereas, "[s]econd degree murder is defined as the unlawful killing of a human being with malice aforethought but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder." *People v. Nieto Benitez*, 4 Cal.4th 91, 102, 13 Cal.Rptr.2d 864, 869, 840 P.2d 969 (1992). "Malice, for the purpose of defining murder, may be express or implied." *Nieto Benitez*, 4 Cal.4th at 102, 13 Cal.Rptr.2d at 870, 840 P.2d 969. Malice "is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." P.C. § 188. When it is established that a killing was the result of an intentional act committed with express or implied malice, "no other mental state need be shown to establish the mental state as malice aforethought." *Id.* As stated by the California Supreme Court,

> [t]he concept of implied malice has both a physical and a mental component. The physical component is satisfied by the performance of an act, the natural consequences of which are dangerous to life. The mental component ... involves an act deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.

*Nieto Benitez*, 4 Cal.4th at 106–07, 13 Cal. Rptr.2d at 872–73, 840 P.2d 969 (citations and internal punctuation omitted); *See also People v. Watson*, 30 Cal.3d 290, 296, 179 Cal.Rptr. 43, 47, 637 P.2d 279 (1981) (stating that "malice may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life").

Here, the jury was presented with sufficient evidence of the petitioner's implied malice to convict him of second-degree murder. This evidence, when viewed in the light most favorable to the prosecution, was more than

sufficient to establish both the physical and mental components of implied malice.[16] That is, there was sufficient evidence that the petitioner performed an act (driving a tow truck with bad brakes at a high rate of speed down a narrow residential street), the natural consequences of which are dangerous to life, that he was subjectively aware of the risk to human life associated with his act, and that he consciously chose to disregard that risk. "Based on [petitioner's] driving record, his prior accident, and the known inadequacy of his brakes on the date in question, the issue was not whether [the petitioner] would have a serious traffic accident, but when." *Contreras*, 26 Cal.App.4th at 956, 31 Cal.Rptr.2d 757. Therefore, the California Supreme Curt's denial of this claim is neither contrary to, nor an unreasonable application, of federal law.

## IX

■ The petitioner's sixth claim is that "[t]he [trial] court's numerous errors in admitting irrelevant, highly prejudicial evidence mandate reversal of [his] conviction." Petition, 3:23–25. Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected. *Estelle*, 502 U.S. at 67–68, 112 S.Ct. at 480; *Engle*, 456 U.S. at 119, 102 S.Ct. at 1567; *Lincoln v. Sunn*, 807 F.2d 805, 815 (9th Cir.1987); *Givens v. Housewright*, 786 F.2d 1378, 1381 (9th Cir.1986). Here, the petitioner has not alleged any violation of his federal constitutional rights, and his evidentiary claims "merely challenge the correctness of the trial court's actions and cannot reasonably be construed to allege a deprivation of federal rights. Accordingly, [they] cannot serve as a basis for obtaining habeas relief." *Givens*, 786 F.2d at 1381.

## X

The petitioner's seventh claim is that the "prosecutor's numerous acts of misconduct operated to [p]etitioner's prejudice and mandate reversal." Petition, 3:26–27. Specifically, the petitioner argues that the prosecutor

committed prejudicial misconduct by improperly filling the courtroom with police officers during closing arguments and by repeatedly failing to provide discovery. Memorandum, 43:22–47:3.

■ The California Court of Appeal, in addressing the petitioner's prosecutorial misconduct claim, found that the petitioner "has failed to preserve this assertion for appellate review" because the defense did not timely object and request an admonition, as required under California law. Return, Exh. B at 23 (citing *People v. Price*, 1 Cal.4th 324, 447, 3 Cal.Rptr.2d 106, 178, 821 P.2d 610 (1991), *cert. denied*, 506 U.S. 851, 113 S.Ct. 152, 121 L.Ed.2d 102 (1992) and *People v. Noguera*, 4 Cal.4th 599, 638, 15 Cal.Rptr.2d 400, 422, 842 P.2d 1160 (1992), *cert. denied*, 512 U.S. 1253, 114 S.Ct. 2780, 129 L.Ed.2d 892 (1994)).

■ The respondents assert that the Court of Appeal's finding constitutes an independent and adequate state law ground that prevents this Court from addressing the merits of this claim. The respondents are correct. Under the independent and adequate state grounds doctrine, a federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991). "[T]he procedural default doctrine is a specific application of the general adequate and independent state grounds doctrine." *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir.1994). The procedural default doctrine "bar[s] federal habeas [review] when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729–30, 111 S.Ct. at 2554. Moreover, "[i]f the intermediate appellate court judgment rests on procedural default and the state supreme court denies review without explanation, the federal courts will consider the claim procedurally defaulted." *Thomas v. Goldsmith*,

---

**16.** Nor is this evidence refuted by the petitioner initially staying to help the parties injured in the collision; the petitioner left the accident scene in

another tow truck before the police arrived, and had to be called back to the accident scene. RT 379:10–26.

979 F.2d 746, 749 (9th Cir.1992) (citing *Ylst*, 501 U.S. at 803, 111 S.Ct. at 2594).

When a state prisoner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565; *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir.1991). The "cause" prong requires petitioner to demonstrate some "objective factor" that precluded him from raising his claims in state court. *McCleskey v. Zant*, 499 U.S. 467, 493–94, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). Ignorance or inadvertence does not constitute cause for a state procedural default. *Murray v. Carrier*, 477 U.S. 478, 486–87, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397 (1986). To show prejudice, petitioner must demonstrate "not merely that the errors ... created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982). The petitioner has the burden of proving both cause and prejudice. *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565.

Here, the California Supreme Court denied a petition for review, thereby affirming the Court of Appeal's finding that this claim had been procedurally defaulted. by petitioner and, thus, it cannot be raised in federal court.[17] *Featherstone v. Estelle*, 948 F.2d 1497, 1506 (9th Cir.1991). The petitioner has not shown cause or prejudice for this procedural default, or even attempted to do so. Therefore, the petitioner's claim of prosecutorial misconduct is procedurally default-

ed, and this Court will not determine its merits.

The petitioner also contends that the prosecutor repeatedly failed to provide his counsel with discovery, specifically, the statements of witnesses interviewed from the petitioner's Department of Motor Vehicles printout, two photographs of the October 6, 1990 accident found in the glove compartment of the petitioner's truck, and the statement of Kevin Jackson, the registered owner of petitioner's tow truck. Memorandum, 46:2–47:3.

The due process clause requires the prosecution to disclose material exculpatory evidence on its own motion, without request. *Kyles v. Whitley*, 514 U.S. 419, 432–34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) (en banc). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *Kyles*, 514 U.S. at 433, 115 S.Ct. at 1565. To determine whether a "reasonable probability" exists, this Court examines the cumulative impact of all the improperly withheld evidence to determine if it undermines confidence in the outcome of the trial. *Kyles*, 514 U.S. at 433–37, 115 S.Ct. at 1565–67; *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *United States v. Sarno*, 73 F.3d 1470, 1505 (9th Cir.1995), *cert. denied*, 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1072 (1996).

The California Court of Appeal, in considering the petitioner's three discovery claims, found as follows:

[1] The trial court ruled the defense knew the People intended to show [peti-

---

**17.** The fact that the California Court of Appeal alternately decided this claim on the merits does not prevent the petitioner's claim from being procedurally barred in this Court. *See Harris v. Reed*, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 1044 n. 10, 103 L.Ed.2d 308 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternate holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir.1992) (same), *cert. denied*, 507 U.S. 992, 113 S.Ct. 1600, 123 L.Ed.2d 163 (1993).

tioner's] subjective knowledge of the danger inherent in bird-dogging through evidence of prior acts...[, and the prosecutor] would necessarily have to call the officers who issued the [traffic] citations. [¶] ... [The trial court then told defense counsel] "you could have attempted to obtain statements from these officers yourself, if you had so wished to do so." [¶] We find no error in the trial court's ruling and no reversible misconduct on the part of the prosecutor.

\* \* ·\* \* \* \*

[¶][2] ... [Although] the defense should have been shown the photographs [of the October 6, 1990 accident] ... [,] there [was] no prejudice....

\* \* \* \* \* \*

[3] Nothing in th[e] asserted failure to provide [a witness statement from Jackson] requires reversal. Defense counsel's objection to the financial arrangement between Jackson and [the petitioner] was sustained and, in any event, Jackson's testimony was an inconsequential aspect of the prosecution's case.

Docs, Exh. B at 26–28.

 These findings are neither contrary to, nor an unreasonable application of, federal law. First, the prosecutor did not suppress evidence of witness statements, since the petitioner knew of the witnesses and could have obtained these statements himself; thus, the failure to provide the witness officers' statements does not constitute Brady error. *See United States v. Bracy,* 67 F.3d 1421, 1428–29 (9th Cir.1995) (finding government's "disclosure provided all the information necessary for the defendants to discover the alleged Brady material on their own, so the government was not guilty of suppressing any evidence favorable to [petitioner]"); *United States v. Aichele,* 941 F.2d 761, 764 (9th Cir.1991) ("When, as here, a defendant has enough information to be able to ascertain the supposed Brady material on his own, there is no suppression by the government."); *United States v. Dupuy,* 760 F.2d 1492, 1501 n. 5 (9th Cir.1985) ("[S]uppression by the Government is a necessary element of a Brady claim, [so] if the means of

obtaining the exculpatory evidence has been provided to the defense, the Brady claim fails." (internal citations omitted)). Second, with regard to the photographs, the petitioner's claim fails because the prosecutor did make the photographs available to the defense, albeit tardily, and the petitioner has not demonstrated how he was prejudiced by the delay in so doing. *See United States v. Alvarez,* 86 F.3d 901, 905 (9th Cir.1996) (no reversible Brady error when prosecutor eventually turned over exculpatory information and petitioner was not prejudiced by delay). Finally, since Jackson's testimony dealt with "an inconsequential aspect of the prosecution's case," the prosecution's failure to provide the defense with a statement from Jackson did not result in the suppression of material evidence. *Bagley,* 473 U.S. at 682, 105 S .Ct. at 3383; *Kyles,* 514 U.S. at 433, 115 S.Ct. at 1565.

## XI

Finally, because this Court concludes that there is no merit to any of petitioner's foregoing claims, the petitioner has not shown that his petition should be reversed for cumulative error. *Rupe v. Wood,* 93 F.3d 1434, 1445 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1017, 136 L.Ed.2d 894 (1997).

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the petition and dismissing the action with prejudice.